# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **VANDERBILT UNIVERSITY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:24-cv-01301** |
| | ) | |
| **NATIONAL LABOR RELATIONS** | ) | |
| **BOARD, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

The National Labor Relations Board ("NLRB" or "Board")[1] has decided to adopt and enforce regulations that present a private university with a seemingly impossible Morton's Fork: either comply with those regulations and lose federal funding for violating its students' privacy; or not comply and face punishment during union election proceedings. Plaintiff Vanderbilt University ("Vanderbilt") brings a claim against the NLRB and Lisa Y. Henderson ("Regional Director"), Regional Director of National Labor Relations Board Region 10 ("Region 10") (collectively, "Defendants") challenging applications of NLRB regulations as applied to it. Now before the Court is Vanderbilt's Motion for Preliminary Injunction (Doc. No. 11), Defendants' Motion to Dissolve Temporary Restraining Order and for Expedited Consideration (Doc. No. 30) ("Motion to Dissolve"), and Defendants' Motion to Suspend Injunctive Order Pending Appeal and for Expedited Consideration (Doc. No. 48) ("Motion to Suspend"). All have

---

[1] As Defendants do, the Court will "refer to the 'NLRB when discussing the agency as a whole, and to 'the Board' when discussing the five-member quasi-judicial, quasi-legislative body established by Section 3(a) of the Act, 29 U.S.C. § 153(a)." (Doc. No. 48-1 at 1 n.3)

been fully briefed and are ripe for review (see Doc. Nos. 11, 30, 34, 35, 39, 40, 43, 43-3, 48, 50).[2] For the following reasons, Vanderbilt's motion will be granted in part; Defendants' Motion to Dissolve will be granted in part; and Defendants' Motion to Suspend (Doc. No. 48) and Motion to Reconsider (Doc. No. 43) will be denied as moot.

## I. FINDINGS OF FACT[3]

Vanderbilt is a 501(c)(3) private university that accepts federal funding and is covered by the Family Education Rights and Privacy Act ("FERPA"). (Doc. No. 1 ¶¶ 19, 26, 52). Vanderbilt is comprised of 10 schools and colleges, including schools for advanced degrees. (Id. ¶ 19). On October 2, 2024, the Vanderbilt Graduate Workers Union United, International Union, UAW ("Union") filed an election petition with Region 10 of the NLRB, seeking to represent a unit of 2,200 graduate student employees at Vanderbilt. (Id. ¶¶ 2, 48). The Regional Director ordered a hearing for October 10, 2024. (Id. ¶ 49).

NLRB regulations provide that Vanderbilt must submit a position statement by October 9, 2024 for the hearing on October 10, 2024. (Id. ¶ 50). That position statement includes, among other things, "a list of the full names, work locations, shifts, and job classifications of all individuals in the proposed unit[,]" (id. ¶ 51). See 29 U.S.C. § 102.63(b)(1)(i)(C). If the position statement omits any of that required information, NLRB regulations provide that Vanderbilt is precluded from raising any issue, offering any evidence, cross-examining witnesses, or presenting any argument relating to the omitted information at the hearing, (Doc. No. 1 ¶ 51). See 29 U.S.C. § 102.66(d).

---

[2] The Court, in the interest of assuring all parties are fully heard, has considered Defendants' proposed sur-reply in its ruling. (See Doc. Nos. 43, 43-3).

[3] The Court's factual findings come from the persuasive and cogent evidence in the record, as well as the allegations in the Complaint (Doc. No. 1) that are not contradicted by the record.

Vanderbilt, as a FERPA-covered educational institution, was concerned about this required disclosure because it understood that FERPA protects against the unapproved disclosure and use of student education records. (Doc. No. 1 ¶¶ 52–54). Vanderbilt reasoned that because the petition concerned a proposed unit of students, disclosure of information required under 29 U.S.C. § 102.63(b)(1)(i)(C) would qualify as an "educational record" under FERPA. (Id. ¶ 53). Vanderbilt believes that it could not provide such student information unless the students consented in writing, or if a FERPA exception applied. (Id.). To address these concerns, Vanderbilt moved to postpone the hearing and the filing of its position statement on October 3, 2024. (Id. ¶ 54). The Regional Director responded four days later, on October 7, 2024, resetting the deadline for Vanderbilt to submit its position statement to October 18, 2024, and rescheduled the hearing for October 21, 2024. (Id. ¶ 55). The Regional Director also issued a subpoena duces tecum ("Subpoena") directing that Vanderbilt provide, by October 18, 2024, the required information about potential voters who should or should not be included in the proposed unit, as required by NLRB regulations. (Id.).

On October 8, 2024, in an attempt to comply with its FERPA obligations, Vanderbilt notified the affected students about the Subpoena to give them an opportunity to exercise their right to object. (Id. ¶ 57; Doc. No. 39-1 at 2). Within eight days of notifying the affected students, 30 of them submitted objections to the Subpoena. (Doc. No. 39-2 at 2). More than 80 students objected to the disclosure of their information requested in the Subpoena by October 24, 2024. (Doc. No. 39-3 at 1). On October 16, 2024, the Regional Director issued another subpoena ("Second Subpoena," collectively with "Subpoena," "Subpoenas") that requested what Vanderbilt understood to be more FERPA-protected information. (Doc. No. 39-3 at 1–2). Vanderbilt again notified the affected students to give them an opportunity to object. (Id.). As of November 4,

2024, more than 100 students responded to Vanderbilt and Region 10 opposing the disclosures requested in the Subpoenas. (Doc. No. 1 ¶ 58; Doc. No. 29 at 28:23–29:2 (noting that as of November 4, 2024, there had been "over 100" objections between the Subpoenas, and "over the number of 90" as to the Subpoena)). On October 15, 2024, two students filed a request to intervene directly in Board Case No. 10-RC-351808 and a motion to stay enforcement of the Subpoena to give them time to present specific objections to the disclosure of FERPA-protected information. (Doc. No. 1 ¶ 59; see Doc. No. 29 at 26:24–27:1 (there has been an "instance where students have gone the extra step to retain counsel and file a motion to intervene to protect their privacy rights")).

Vanderbilt again moved to postpone the hearing, the filing of its position statement, as well as its response to the Subpoena. (Id. ¶ 60). On October 18, 2024, the "Region" denied Vanderbilt's motion and the two graduate students' request to intervene and motion to stay the Subpoena. (Id. ¶ 61). The two graduate students responded by filing an emergency appeal to the Board. (Id. ¶ 62). Vanderbilt also sought emergency expedited relief from the Board so that it would not be forced to disclose the students' FERPA-protected information before the students' objections were adjudicated. (Id.). Both appeals are still before the Board. (Id.).

Vanderbilt complied with the Subpoena on October 18, 2024 by filing its position statement with redacted student information. (Id. ¶ 63; Doc. No. 39-4 (cover sheet providing NLRB Field Examiner Jill Adkins with "an alphabetical list comprising the petitioned-for unit")). The hearing proceeded on October 21, 2024. (Doc. No. 1 ¶ 64; Doc. No. 27-4 at 1). At the hearing, the Union moved to preclude Vanderbilt from "presenting any evidence or arguments contesting the appropriateness of" the proposed union or "any individual's eligibility to be a part of that union" because its position statement did not "provide the full names of any of the individuals in the proposed unit." (Doc. No. 1 ¶ 64; Doc. No. 27-4 at 20:6–12, 21:24–22:8). The next day, on

4

October 22, 2024, Vanderbilt filed a written opposition to the Union's motion for preclusion, arguing the redacted information is protected under FERPA. (Doc. No. 1 ¶ 65; Doc. No. 27-5 at 133, 205:5–14). The NLRB hearing officer orally denied the Union's preclusion motion, "given the FERPA issue." (Doc. No. 27-5 at 205:24–206:2). The hearing officer further reasoned that the information redacted by Vanderbilt was not necessary to determine the unit scope issue that were being litigated at the hearing. (Doc. No. 1 ¶ 65; Doc. No. 27-5 at 206:4–6 ("We do not need, at this stage, the need of – the names of employees for the Region to make a unit determination.")).

However, on October 23, 2024, the Union filed a request for review with the Board. (Doc. No. 1 ¶ 66). Two days later, the hearing officer, at the Regional Director's instruction, clarified the October 22 decision denying the Union's preclusion motion. (Id. ¶ 67; Doc. No. 27-6 at 634, 646:24–647:1). Instead, the hearing officer, at the Regional Director's instruction, determined that Vanderbilt would be precluded from offering evidence or argument on the unit's appropriateness, given it did not provide the required information in its statement of position. (Doc. No. 1 ¶ 67; Doc. No. 27-6 at 649:11–650:3). On October 28, 2024, the hearing officer, at the Regional Director's instruction, precluded Vanderbilt from making an offer of proof regarding the evidence it would have presented had it not been precluded from doing so. (Doc. No. 1 ¶ 69; Doc. No. 27-7 at 655, 680:1–7). That day, the hearing officer closed the record. (Id.).

The next day, on October 29, 2024, Vanderbilt brought the instant action, alleging three of the NLRB's regulations are arbitrary, capricious, contrary to law and in excess of the NLRB's statutory authority as applied to Vanderbilt under the Administrative Procedures Act ("APA"). (Doc. No. 1). On October 30, 2024, Vanderbilt sought a temporary restraining order and preliminary injunctive relief to enjoin Defendants from taking any further action on the pending election petition involving graduate students at Vanderbilt. (Doc. No. 11). The Court granted

Vanderbilt's motion for a temporary restraining order (Doc. No. 15) and later continued it to a status quo injunction pending the resolution of Vanderbilt's motion for preliminary injunctive relief. (Doc. No. 33). Defendants oppose Vanderbilt's motion for a preliminary injunction, and they have separately moved to dissolve the temporary restraining order and suspend the injunctive order pending appeal. (Doc. Nos. 30, 39, 48).

## II.    DISCUSSION

As an initial matter, ruling on the instant motions presents a unique procedural issue for the Court. Defendants have filed an interlocutory appeal pertaining to the Court's October 30, 2024 temporary restraining order (Doc. No. 15) and the November 13, 2023 status quo injunction (Doc. No. 33). They have also moved to suspend the Court's injunctive order pending appeal pursuant to Federal Rule of Civil Procedure 62(d). (See Doc. No. 48). Rule 62(d) gives the Court authority to grant or deny the parties' motions, despite the current interlocutory appeal. Rule 62(d) states, in relevant part:

> While an appeal is pending from an interlocutory order or final judgment that grants, continues, modifies, refuses, dissolves, or refuses to dissolve or modify an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights.

Fed. R. Civ. P. 62(d) (emphasis added); see also Fed. R. App. P. 8(a)(1)(C) ("A party must ordinarily move first in the district court for . . . an order suspending, modifying, restoring, or granting an injunction while an appeal is pending."). The Court held Defendants' motion to suspend (Doc. No. 48) in abeyance pending the Court's ruling here. (Doc. No. 51). The Court will now address the issues the parties raise on the merits. See Fed. R. Civ. P. 62(d); see Williamson v. Recovery Ltd. P'ship, 731 F.3d 608, 629 (6th Cir. 2013) (a district court retains jurisdiction even after an interlocutory appeal is filed "to proceed with matters that will aid the appellate process") (internal citation omitted).

6

Vanderbilt seeks a preliminary injunction enjoining Defendants from enforcing three NLRB regulations, 29 C.F.R. §§ 102.63(b)(1)(i)(C), 102.66(d), and 102.67(1) (collectively, "Regulations"), against it in the election proceedings.[4]  (Doc. No. 40 at 12).  Defendants argue that this request is inappropriate for both jurisdictional and meritorious reasons.  (Doc. No. 31 at 11–20).  The Court will first address the parties' jurisdiction arguments, followed by the merits of Vanderbilt's motion.  See Mich. State Emps. Ass'n v. Marlan, 608 F. Supp. 85, 87 (W.D. Mich. 1984) ("When a motion is based on more than one ground," the Court should consider the jurisdictional arguments first because "if must dismiss the complaint for lack of subject matter jurisdiction," the other disputes between the parties "become moot and need not be determined."); see also Moir v. Greater Cleveland Reg'l Transit Auth., 895 F.2d 266, 269 (6th Cir. 1990).

A.  Subject Matter Jurisdiction

Defendants repeatedly contend the Court lacks subject-matter jurisdiction for three reasons: (1) the Court lacks jurisdiction to enjoin NLRB proceedings generally; (2) under the Norris-LaGuardia Act ("NLGA"), the Court is jurisdictionally barred from entering an injunction blocking the current election proceedings; and (3) Vanderbilt fails to allege an injury in fact sufficient to satisfy Article III standing.[5]  (Doc. No. 31 at 10–18; Doc. No. 39 at 18).  Vanderbilt

---

[4]  The Complaint erroneously refers to 29 C.F.R. § 102.63(b)(i)(C), rather than 29 C.F.R. 102.63(b)(1)(i)(C), when discussing the relevant regulation pertaining to Vanderbilt's statement of position.  (See Doc. No. 1 ¶ 72).  Vanderbilt often makes the same mistake in its briefing.  (See Doc. No. 12 at 11).  However, given both parties refer to the correct regulation at issue in their briefing, 29 C.F.R. 102.63(b)(1)(i)(C), the Court will assume the Vanderbilt's reference to 29 C.F.R. § 102.63(b)(i)(C), a non-existent regulation, is in error.  (See Doc. No. 12 at 9; Doc. No. 31 at 8; Doc. No. 39 at 2, 5).  The Court will refer to 29 C.F.R. 102.63(b)(1)(i)(C) as the regulation at issue as to the statement of position going forward.

[5]  Defendants assert Vanderbilt "fails to allege a plausible injury."  (Doc. No. 39 at 18).  While Defendants neither reference standing directly, nor do they articulate the elements necessary to satisfy it, (see id.), the Court infers from the cases Defendants cite to that they intended to argue Vanderbilt cannot satisfy the first prong of Article III standing, an injury in fact.  (See id. (citing

7

opposes because: (1) the National Labor Relations Act ("NLRA") does not strip the Court of jurisdiction because its provisions apply only to Board orders pertaining to unfair labor disputes; (2) the NLGA does not apply because Vanderbilt has no "labor dispute" with Defendants; and (3) Vanderbilt has alleged injuries to satisfy Article III standing. (Doc. No. 34 at 7–16; Doc. No. 40 at 6).

As an initial matter, it is unclear what federal rule or statute Defendants rely on for their jurisdictional arguments. (See Doc. No. 30 (motion is made pursuant to Rule 65(b)(4); Doc. No. 31 at 10–18 (not discussing any federal rule in connection with jurisdictional arguments); Doc. No. 39 at 18 (discussing Vanderbilt's "fail[ure] to allege a plausible injury" by referencing Rule 12(b)(6)). This is important because the Court's analysis depends on whether Defendants' subject matter arguments are brought under Rule 12(b)(1) or (b)(6). Should the Court find Defendants' arguments fall under the latter category, the Court may be "instructed to treat the motion as one for summary judgment," at least as to Defendants' standing argument, given Defendants submitted "additional materials 'outside the pleadings'" in that briefing, (see Doc. Nos. 39-1, 39-2, 39-3, 39-4). Ohio Nat'l Life Ins. Co. v. United States, 922 F.2d 320, 325 (6th Cir. 1990). Despite Defendants' reference to Rule 12(b)(6) in their standing argument, to avoid unwarranted surprise to the parties, and given Defendants do not rely on materials "outside the pleadings" to support their jurisdictional arguments, the Court will construe these arguments as being brought pursuant to Rule 12(b)(1). See Armengau v. Cline, 7 F. App'x 336, 343 (6th Cir. 2001) ("Because of the risk of prejudicial surprise arising from the court's treating a motion to dismiss as a motion for

---

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007) and Ohio Nat'l Life Ins. Co. v. United States, 922 F.2d 320, 325 (6th Cir. 1990) (referring to the Rule 12(b)(6) standard)).

summary judgment, Rule 12(b)[(6)] further requires notice and an opportunity to supplement the record before the court enters summary judgment.").

"[W]here subject matter jurisdiction is challenged," as it is here, "the *plaintiff* has the burden of proving jurisdiction in order to survive the motion." Rogers v. Stratton Indus., Inc., 798 F.2d 913, 915 (6th Cir. 1986); see Abbot v. Michigan, 474 F.3d 324, 328 (6th Cir. 2007). A "motion for lack of subject matter jurisdiction can challenge the sufficiency of the pleading itself (facial attack) or the factual existence of subject matter jurisdiction (factual attack)." Cartwright v. Garner, 751 F.3d 752, 759 (6th Cir. 2014) (citing United States v. Ritchie, 15 F.3d 592, 598 (6th Cir. 1994)). A facial attack goes to whether the plaintiff has alleged a basis for subject matter jurisdiction, and the court takes the allegations of the complaint as true for purposes of the analysis. Ritchie, 15 F.3d at 598. A factual attack challenges the factual existence of subject matter jurisdiction. Id. In the case of a factual attack, the court has broad discretion with respect to what evidence to consider in deciding whether subject matter jurisdiction exists, including evidence outside of the pleadings, and can weigh the evidence and determine the effect of that evidence on the court's authority to hear the case. Id. Here, the Court understands Defendants are making a facial challenge, so the Court limits its consideration to the allegations of the Complaint and assumes them to be true. (Doc. No. 31 at 10–18; Doc. No. 39 at 18).

With this background and these standards in mind, the Court will now address Defendants' jurisdictional arguments as follows: first, whether the NLRA strips this Court of jurisdiction; second, and alternatively, whether the NLGA bars the Court from issuing the injunctive relief Vanderbilt seeks here; and third, whether Vanderbilt has alleged an injury in fact sufficient to satisfy Article III standing.

1. <u>Whether the NLRA Strips this Court of Subject Matter Jurisdiction</u>

The Court first turns to Defendants' primary argument. Defendants vigorously maintain, as a threshold matter, that this APA dispute concerning the Regulations must be dismissed for lack of subject matter jurisdiction because the NLRA divests this Court of jurisdiction. (Doc. No. 31 at 13 ("This Court's lack of subject-matter jurisdiction precludes any possibility of Vanderbilt succeeding on the merits of its claims.")). In support of their contention, Defendants pose four arguments: (1) a district court generally lacks jurisdiction to enjoin NLRB proceedings; (2) Vanderbilt has not cited a valid basis for jurisdiction; (3) Vanderbilt cannot establish jurisdiction under <u>Leedom v. Kyne</u>, 358 U.S. 184 (1958); and (4) neither <u>Thunder Basin Coal Co. v. Reich</u>, 510 U.S. 200 (1994), nor <u>Axon Enterprises, Inc. v. FTC</u>, 598 U.S. 175 (2023), establish jurisdiction. (Doc. No. 31 at 12–18). Vanderbilt strongly contests this, arguing "nothing in the NLRA strips this Court of jurisdiction." (Doc. No. 34 at 3). Vanderbilt contends that Defendants' jurisdictional arguments fail because the NLRA limits its direct judicial review provision to final Board orders as pertaining to unfair labor practices, but does not similarly limit judicial review of NLRB regulations pertaining to other matters, such as at issue here. (Doc. No. 34 at 13–16). Despite relying on <u>Kyne</u>, <u>Thunder Basin</u>, and <u>Axon</u> in its Complaint, (<u>see</u> Doc. No. 1 at ¶¶ 80–91), Vanderbilt makes no efforts to respond to Defendants' arguments as to the inapplicability of those cases here. (<u>See generally</u> Doc. Nos. 34 and 40). Given the complex legal issues at play here, the Court will first provide background on the NLRA's jurisdictional scheme and the NLRB's rulemaking before addressing the Court's subject matter jurisdiction in this case.

a. <u>Relevant Overview of the NLRA</u>

The NLRA "covers two important topics in labor relations: the protection of employees; right to elect representatives of their choice, and the prevention of unfair labor practices." <u>Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. NLRB</u>, 57 F.4th 1023, 1027 (D.C. Cir. 2023) ("<u>AFL-</u>

10

CIO II"); see 29 U.S.C. §§ 158, 159. The Act addresses these topics separately, with "section 8 prohibiting unfair labor practices and providing for enforcement against them, see id. § 158, and section 9 outlining the process for conducting elections by which employees may select unions to represent them, see id. § 159." AFL-CIO II, 57 F.4th at 1027–28. Indeed, the Act enumerates the various actions that constitute "unfair labor practices" on the part of employers and employees in one section. See 29 U.S.C. § 158. In a separate section, the Act separately addresses "representatives and elections" for collective bargaining purposes. See id. § 159. Overall, the Act makes clear that Congress intended to "encourage[e] the practice and procedure of collective bargaining" and "protect[] the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing[.]" 29 U.S.C. § 151.

Congress created the NLRB in 1935 when it enacted the NLRA. See 29 U.S.C. §§ 151–69. The Act bestows upon the NLRB two significant powers: (1) the ability to engage in general and specific rulemaking, see id. §§ 156, 159(c)(1); and (2) the authority to adjudicate certain disputes that arise between labor organizations, employees, and employers, see id. §§ 158–60. See Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. NLRB., 466 F. Supp. 3d 68, 75 (D.D.C.), order amended on reconsideration, 471 F. Supp. 3d 228 (D.D.C. 2020), and aff'd in part, rev'd in part and remanded, 57 F.4th 1023 (D.C. Cir. 2023) ("AFL-CIO I").[6] The Act empowers the NLRB with different powers with respect to handling unfair labor practices and collective bargaining practices. As to the former, the Act permits the NLRB to "prevent any person from engaging in any unfair labor practice affecting commerce." Id. § 160(a). The Act further bestows on the NLRB with additional powers over unfair labor practices, including: the ability to issue a complaint and

---

[6] To the extent the Court cites to AFL-CIO I, it is in relation to the jurisdictional analysis that was upheld by the D.C. Circuit on remand. See AFL-CIO II, 57 F.4th at 1032–34.

11

schedule a hearing when someone is accused of engaging in unfair labor practices, see id. § 160(b); the authority to take testimony, make findings, order the cessation of unfair labor practices, and take actions to effectuate statute policies, see id. § 160(c); and the ability to modify its orders until judicial review or enforcement is sought, see id. § 160(d). See AFL-CIO I, 466 F. Supp. 3d at 75–76. Separately, as to collective bargaining practices, the Act confers upon the NLRB the ability to determine "the unit appropriate for the purposes of collective bargaining[,]" id. § 159(b), and to adjudicate any "question of representation affecting commerce[,]" id. § 159(c)(1)(B). See AFL-CIO I, 466 F. Supp. 3d at 75. "A question of representation exists if a proper petition has been filed concerning a unit appropriate for the purpose of collective bargaining or concerning a unit in which an individual or labor organization has been certified or is being currently recognized by the employer as the bargaining representative." 29 C.F.R. § 102.64 (2019).

The Act handles unfair labor practices and collective bargaining practices differently regarding its jurisdictional review schemes, as well. As related to unfair labor practices, the Act "provides for direct review in the federal appellate courts of at least some NLRB actions." AFL-CIO II, 57 F.4th at 1028. "Section 10 of the Act, titled 'Prevention of unfair labor practices,' includes the Act's only such grant of judicial review directly in a court of appeal." Id. (citing 29 U.S.C. § 160(f)). Section 10 provides, in relevant part:

> The Board shall have power to petition any court of appeals of the United States, or if all the courts of appeals to which application may be made are in vacation, any district court of the United States, within any circuit or district, respectively, wherein the unfair labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of such order and for appropriate temporary relief or restraining order, and shall file in the court the record in the proceedings, as provided in section 2112 of title 28.

29 U.S.C. § 160(e) (emphasis added). It further asserts:

> Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States

court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia[.]

29 U.S.C. § 160(f) (emphasis added).  "The Act thus provides for direct appellate review of a 'final order,' and places venue where 'the unfair labor practice in question' took place."  AFL-CIO II, 57 F.4th at 1028 (citing 29 U.S.C. § 160(f)).  As to collective bargaining practices, however, no such jurisdictional grant exists.  Section 9(d), which provides for the "Petition for Enforcement or Review" of collective bargaining practices, states:

> Whenever an order of the Board made pursuant to section 160(c) of this title is based in whole or in part upon facts certified following an investigation pursuant to subsection (c) of this section and there is a petition for the enforcement or review of such order, such certification and the record of such investigation shall be included in the transcript of the entire record required to be filed under subsection (e) or (f) of section 160 of this title, and thereupon the decree of the court enforcing, modifying, or setting aside in whole or in part the order of the Board shall be made and entered upon the pleadings, testimony, and proceedings set forth in such transcript.

29 U.S.C. § 159(d).  Absent from this language is a direct review provision akin to the one pertaining to final orders of unfair labor practices under section 10.  See 29 U.S.C. § 160(f). Importantly, "[n]owhere does the Act specifically address review of Board actions pertaining to representation elections."  AFL-CIO II, 57 F.4th at 1028.

### b.  The NLRB's 2014 Rule and Amendments

Over recent years, the NLRB has regulated the procedures relating to collective bargaining practices through a series of rulemakings.  See 29 U.S.C. § 159(c)(1).  In 2014, the NLRB issued a rule that "retain[ed] the essentials of existing representation case procedures," but provided amendments to "remove unnecessary barriers to the fair and expeditious resolution of representation cases."  79 Fed. Reg. at 74,308.  Three of those amendments are relevant to the instant dispute.  First, the 2014 rule required "[n]on-petitioning parties[,]" such as employers, to

13

provide information about the employees in the petitioned-for unit in their statements of position. Id. at 74,309.  Second, the 2014 rule adopted a "preclusion" paragraph that bars parties from offering evidence "of issues not timely raised" in statements of positions.  79 Fed. Reg. at 74,394. Third, the 2014 rule required employers to provide voter list information to other parties and the regional director within two business days of the direction of election.  79 Fed. Reg. at 74,310.

In 2019, the NLRB issued amendments to the timing of compliance for the statement of position and voter list information, requiring the employer's statement of position to be due eight business days "following the issuance and service of the notice of hearing," 84 Fed. Reg. at 69,533, and delays the employer's deadline to produce voter lists to five business days, rather than two, id. at 69,531.  As applicable here, the final rule on employers' statements of position, Rule 102.63(b)(1)(i)(C), provides:

> The Statement of Position shall include a list of the full names, work locations, shifts, and job classifications of all individuals in the proposed unit as of the payroll period preceding the filing of the petition who remain employed at the time of filing, and if the employer contends that the proposed unit is inappropriate, the employer shall separately list the full names, work locations, shifts, and job classifications of all individuals that the employer contends must be added to the proposed unit to make it an appropriate unit. The employer shall also indicate those individuals, if any, whom it believes must be excluded from the proposed unit to make it an appropriate unit. The list(s) of names shall be alphabetized (overall or by department) and be in an electronic format approved by the General Counsel unless the employer certifies that it does not possess the capacity to produce the list in the required form.

29 C.F.R. § 102.63(b)(1)(i)(C) (emphasis added).  The final rule on preclusion, Rule 102.66(d), provides:

> **Preclusion.** A party shall be precluded from raising any issue, presenting any evidence relating to any issue, cross-examining any witness concerning any issue, and presenting argument concerning any issue that the party failed to raise in its timely Statement of Position or to place in dispute in response to another party's Statement of Position or response, except that no party shall be precluded from contesting or presenting evidence relevant to the Board's statutory jurisdiction to process the petition. Nor shall any party be precluded, on the grounds that a voter's

14

eligibility or inclusion was not contested at the pre-election hearing, from challenging the eligibility of any voter during the election. If a party contends that the proposed unit is not appropriate in its Statement of Position but fails to specify the classifications, locations, or other employee groupings that must be added to or excluded from the proposed unit to make it an appropriate unit, the party shall also be precluded from raising any issue as to the appropriateness of the unit, presenting any evidence relating to the appropriateness of the unit, cross-examining any witness concerning the appropriateness of the unit, and presenting argument concerning the appropriateness of the unit. If the employer fails to timely furnish the lists of employees described in § 102.63(b)(1)(i)(C), (b)(2)(iii), or (b)(3)(i)(D), the employer shall be precluded from contesting the appropriateness of the proposed unit at any time and from contesting the eligibility or inclusion of any individuals at the pre-election hearing, including by presenting evidence or argument, or by cross-examination of witnesses.

29 C.F.R. § 102.66(d) (emphasis added). The final rule for employer voter lists, Rule 102.67(l), provides:

> **Voter list.** Absent extraordinary circumstances specified in the direction of election, the employer shall, within 2 business days after issuance of the direction, provide to the Regional Director and the parties named in such direction a list of the full names, work locations, shifts, job classifications, and contact information (including home addresses, available personal email addresses, and available home and personal cellular "cell" telephone numbers) of all eligible voters. The employer shall also include in separate sections of that list the same information for those individuals who will be permitted to vote subject to challenge. In order to be timely filed and served, the list must be received by the Regional Director and the parties named in the direction respectively within 2 business days after issuance of the direction of election unless a longer time is specified therein. The list of names shall be alphabetized (overall or by department) and be in an electronic format approved by the General Counsel unless the employer certifies that it does not possess the capacity to produce the list in the required form. When feasible, the list shall be filed electronically with the Regional Director and served electronically on the other parties named in the direction. A certificate of service on all parties shall be filed with the Regional Director when the voter list is filed. The employer's failure to file or serve the list within the specified time or in proper format shall be grounds for setting aside the election whenever proper and timely objections are filed under the provisions of § 102.69(a)(8). The employer shall be estopped from objecting to the failure to file or serve the list within the specified time or in the proper format if it is responsible for the failure. The parties shall not use the list for purposes other than the representation proceeding, Board proceedings arising from it, and related matters.

29 C.F.R. § 102.67(l) (emphasis added).  Vanderbilt contends these rules (i.e., the Regulations) as applied to it in the current election proceedings with its graduate students, are arbitrary, capricious, not in accordance with the law, and in excess of the NLRB's statutory authority under the APA because they violate FERPA.  (Doc. No. 1).  In turn, Vanderbilt seeks relief preventing the application of the Regulations to it in various capacities.  (Doc. No. 1 at VI (prayer for relief)).

c. The NLRA Does Not Divest This Court of Jurisdiction Over Vanderbilt's Regulatory Challenges.

Federal courts are undoubtedly courts "of limited jurisdiction."  Charvat v. EchoStar Satellite, LLC, 630 F.3d 459, 464 (6th Cir. 2010).  The dispute here, whether district courts have subject matter jurisdiction to entertain APA challenges to regulations promulgated by the NLRB, stems from the parties' interpretations of § 160(f) of the NLRA.  When interpreting direct-review statutes, such as § 160(f) of the NLRA, "[w]hether initial subject-matter jurisdiction lies initially in the court of appeals must of course be governed by the intent of Congress and not by any views we may have about sound policy."  Florida Power & Light Co. v. Lorion, 470 U.S. 729, 745 (1985).  In determining how much jurisdiction Congress has provided a court by statute, courts must "'act on the basis of statutory language and probative legislative history' in order to discern congressional intent with respect to jurisdictional provisions, including direct review provisions[.]"  AFL-CIO I, 466 F. Supp. 3d at 81 (citing Am. Petroleum Inst. v. S.E.C., 714 F.3d 1329, 1332 (D.C. Cir. 2013)).

Beginning with the text of § 160(f), "it is clear that this statutory provision is directed to 'final order[s]' of the NLRB that 'grant[] or deny[] in whole or in part the relief sought'" in the context of the 'unfair labor practice' in question."  AFL-CIO I, 466 F. Supp. 3d at 83 (citing 29 U.S.C. § 160(f)).  As the D.C. Circuit reasoned, § 160(f)'s "textual reference to unfair labor practices, combined with the absence of any mention of determinations governing representation

16

or elections, strongly suggests that the provision is only triggered when some kind of unfair labor practice is at issue." AFL-CIO II, 57 F.4th at 1031–32 (internal citation and quotations omitted). By the NLRA's clear terms, the direct-review provision of § 160(f) "is quite specific and relatively narrow, insofar as it provides for direct judicial review in the court of appeals of only those 'orders' of the NLRB that are 'final,' and such final orders must 'grant[] or deny[]' some type of 'relief' that has been 'sought' by an entity that the NLRA governs." AFL-CIO I, 466 F. Supp. 3d at 83 (citing 29 U.S.C. § 160(f)). As then-Judge, now-Justice Ketanji Brown Jackson aptly explained in AFL-CIO I,

> Setting aside for the moment whether or not the "final order" requirement is broad enough to cover [] NLRB "rule[s]" like the one at issue here, there is no reasonable argument that credibly casts the [Regulations] as an agency action that grants or denies any relief to a regulated party, and this problem alone is sufficient to cast doubt on [Defendants'] contention that section 160(f) applies to [Vanderbilt's] claims. But what clinches the conclusion that section 160(f) does not divest the district court of the subject-matter jurisdiction that it would otherwise have to address [Vanderbilt's] claims under 28 U.S.C. § 1331 is the very simple fact that what is being directed to the court of appeals for direct-review per the text of the statute is NLRB actions concerning the "unfair labor practice in question"—a textual reference that strongly suggests that the provision is only triggered when some kind of unfair labor practice is at issue. Cf. Am. Fed'n of Labor v. N.L.R.B., 308 U.S. 401, 409, 60 S.Ct. 300, 84 L.Ed. 347 (1940) (holding that section 160(f) authorizes judicial review of NLRA section 158 "unfair labor practice" orders, but it does not authorize judicial review of NLRA section 159 "representation" adjudications).

466 F. Supp. 3d at 83–84 (emphasis added).

The text and structure of section 160 of the NLRA confirms this is the only reasonable interpretation of the § 160(f) direct-review provision. See Am. Petroleum Inst., 714 F.3d at 1132. In fact, "[a]ll the [] subdivisions [of section 160] relate exclusively to proceedings for the prevention of unfair labor practices." See Am. Fed'n of Labor v. NLRB, 308 U.S. 401, 407 (1940) ("AFL"). Those unfair labor practices are subject to a scheme of judicial review contemplated by Congress, as evidenced by the provisions delineated in 29 U.S.C. § 160(e) and 29 U.S.C. § 160(f).

17

See 29 U.S.C. § 160(e) (plainly referring to the Board's authority to petition to a court appeals as to the "unfair labor practice" in question, and mandating that the Board shall "file in the court the record in the proceedings").

Further, as the Court in AFL-CIO II reasons, the rest of the text and structure of the Act support this distinction, given the Act addresses these topics separately throughout.  AFL-CIO II, 57 F.4th at 1027–28.  As explained above, see supra, Section II.A.1.a, the NLRA handles unfair labor practices differently from representation and election matters.  AFL-CIO II, 57 F.4th at 1031–32.  While unfair labor practices are subject to a direct review provision, 29 U.S.C. § 160(f), collective bargaining practices, have no such mandate under the Act, as 29 U.S.C. § 159(d).  See AFL-CIO II, 57 F.4th at 1031–32.  The Act's distinction between unfair labor practices and collective bargaining practices persists through its definitions of each in different sections, as well as the Act's different provisions pertaining to the NLRB's authority over each.  See 29 U.S.C. §§ 158, 159.  The plain structure of the NLRA demonstrates that § 160(f) applies only to unfair labor practices.  See Chamber of Com. of United States v. NLRB, 723 F. Supp. 3d 498, 513 (E.D. Tex. 2024) ("Chamber of Com.") (the NLRA's "overall text, structure, and purpose unambiguously defeat any inference of an intent to displace § 1331 jurisdiction over challenges to Board rulemaking"); Dep't & Specialty Store Emp. Union, Local 1265 v. Brown, 284 F.2d 619, 626 (9th Cir. 1960) ("Separate and distinct" provisions of the NLRA "govern the procedure in unfair labor practice cases and in representation cases[,]" and "[t]he procedure to be followed in the unfair labor practice cases is outlined in some detail" in section 160, "which deal[s] with unfair labor

18

practices only and do[es] not deal with the area of representation elections[,]" addressed in section 159 of the NLRA.).[7]

Somewhat perplexingly, Defendants do not address the nature of the Regulations at issue, nor do they address the case law relied upon here. (See Doc. Nos. 35, 39, 43-3 (failing to properly address AFL-CIO II, AFL-CIO I, and Chamber of Com.). Rather than grapple with the distinction between the jurisdictional grant conferred in the NLRA as related to final orders on unfair labor practices, but not as to collective bargaining practices, Defendants see this as a distinction without a difference. For the reasons just discussed, the Court cannot do the same. Instead, the Court agrees with Vanderbilt that § 160(f) is inapplicable here. Unfair labor practices, specific or general, are not at issue in this enforcement challenge to the Regulations at issue, all of which concern "exclusively elections regarding union representation." AFL-CIO II, 57 F.4th at 1032. Each of the Regulations governs the process for determining the appropriate election unit, and do not address unfair labor practices. See 29 C.F.R. §§ 102.63(b)(1)(i)(C), 102.66(d), 102.67(l). As AFL-CIO II explained, the text of § 160(f) of the NLRA that provides direct appellate review "is

_____

[7] Vanderbilt asserts this Court has jurisdiction, in part, because the Regulations are not "final orders" under § 160(f), as required to be encompassed in the NLRA's jurisdictional provisions. (See Doc. No. 34 at 3). Defendants do not respond to this argument. The Court finds the logic of the court in Chamber of Com. that rulemaking cannot be viewed as "granting or denying" the "relief sought" as referenced in § 160(f) convincing. Chamber of Com., 723 F. Supp. 3d at 511–12. And, while the court in AFL-CIO I did not find jurisdiction over the APA claims at issue there based on whether or not the applicable regulations were "final orders," it did opine that "there is no reasonable argument that credibly casts the [challenged rule] as an agency action that grants or denies relief to any regulated party, and this problem alone is sufficient to cast doubt on the NLRB's contentions that section 160(f) applies to the [challenger's] claims." AFL-CIO I, 466 F. Supp. 3d at 83. Still, as is relevant here, the Court comes to the same conclusion the AFL-CIO I and AFL-CIO II courts did—it need not decide whether Regulations are "final orders" for the purposes of § 160(f) because the Regulations clearly do not apply to unfair labor practices, and are therefore not subject to the NLRA's direct review provision. See AFL-CIO I, 466 F. Supp. 3d at 86 (whether regulations were "orders" for the purposes of § 160(f) was "entirely besides the point" given the subject of the regulations at issue was not unfair labor practices).

seemingly limited to orders regarding unfair labor practices, and we are reviewing [] rule[s] unrelated to such practices." AFL-CIO II, 57 F.4th at 1031; see Am. Fed'n of Labor, 308 U.S. at 407 ("AFL") ("All the other subdivisions [of section 160] relate exclusively to proceedings for the prevention of unfair labor practices.").  Considering this, the text and structure of the NLRA, and guidance from the only cases the Court is aware of addressing this issue, the outcome is clear: nothing in § 160(f) strips this Court of jurisdiction from reviewing a challenge to the Regulations here, which do not pertain to unfair labor practices.  See AFL-CIO II, 57 F.4th at 1031–32; Chamber of Com., 723 F. Supp. 3d at 511–12; AFL-CIO I, 466 F. Supp. 3d at 86 (the text, structure, and legislative history of section 160(f) establishes that "the subject of a petition for review that is filed with the court of appeals under section 160(f) must be an NLRB action that pertains to unfair labor practices as opposed to any other topic that the agency might have acted to address"); see also 29 U.S.C. § 160(e) (referencing only unfair labor practices in relation to the Board's power to petition any court of appeals); 29 U.S.C. § 160(f) (referencing a person's right to seek review with a court of appeals of final orders pertaining to unfair labor practices); 29 U.S.C. § 159(d) (providing for means of review of representation and election orders without a jurisdictional grant).

The cases Defendants cite to in support of their position that this Court does not have jurisdiction do not counsel for an alternative outcome as to Vanderbilt's regulatory challenges. The first set of cases Defendants heavily rely upon, AFL and its progeny, are of no import.  In AFL, the Supreme Court held that § 160(f) authorizes direct judicial review of "unfair labor practice" final orders to courts of appeals, but does not authorize such judicial review of § 159 "representation" certifications.  Id. at 409.  As Vanderbilt notes, (see Doc. No. 34 at 13), the Supreme Court in AFL found those election certifications were only directly reviewable in a court

of appeals after the employer refused to bargain, leading to an unfair labor practice. See id. However, the Supreme Court in AFL expressly stated that it was not deciding whether the NLRA "foreclosed review of its challenged action by independent suit in the district court" because "that question [was] not presented for decision[.]" Id. at 412 (emphasis added). AFL and its progeny do not answer the question of whether a district court has jurisdiction to review representation or election decisions or orders, but rather whether a court of appeals has such authority under § 160(f). See Kindred Nursing Ctrs. E, LLC v. NLRB, 727 F.3d 552, 558 (6th Cir. 2013) (addressing its own jurisdiction over an unfair labor practice charge in light of AFL). Given that the issue before the Court is whether *it* has jurisdiction over Vanderbilt's claim, rather than a court of appeals, AFL is inapplicable here. See AFL, 308 U.S. at 412.

The second set of case law Defendants rely on, Kyne and its progeny, also fails to counsel for a different outcome on Vanderbilt's challenge to the Regulations. Kyne provides for the avenue to challenge a Board order in a representation proceeding in district court that was "made in excess of its delegated powers and contrary to a specific prohibition in the Act." Kyne, 358 U.S. at 184. Kyne applies this principle to parties bringing challenges in district courts pertaining to "Board representation orders [which courts have found] are not subject to direct judicial review." Hartz Mountain Corp. v. Dotson, 727 F.2d 1308, 1311 (D.C. Cir. 1984); see Goethe House, 869 F.2d at 78–79 (district court does not have jurisdiction to review a Board order in representation proceeding absent the Kyne exception). Following its decision in AFL, the Supreme Court has held that orders made under § 159(c) "are not directly reviewable in the courts" considering "Congress explicitly intended to impose precisely such delays" on their review in federal courts. Boire v. Greyhound Corp., 376 U.S. 473, 576–78 (1964). As Boire reasons,

21

At the time of the original passage of the National Labor Relations Act in 1935, the House Report clearly delineated the congressional policy judgment which underlay the restriction of judicial review to that provided for in s[ection] 9(d):

When an employee organization has built up its membership to a point where it is entitled to be recognized as the representative of the employees for collective bargaining, and the employer refuses to accord such recognition, the union, unless an election can promptly be held to determine the choice of representation, runs the risk of impairment of strength by attrition and delay while the case is dragging on through the courts, or else is forced to call a strike to achieve recognition by its own economic power. Such strikes have been called when election orders of the National Labor Relations Board have been held up by court review.

And both the House and the Senate Reports spelled out the thesis, repeated on the floor, that the purpose of s[ection] 9(d) was to provide for review in the courts only after the election has been held and the Board has ordered the employer to do something predicated upon the results of the election. Congressional determination to restrict judicial review in such situations was reaffirmed in 1947, at the time that the Taft-Hartley amendments were under consideration, when a conference committee rejected a House amendment which would have permitted any interested person to obtain review immediately after a certification because, as Senator Taft noted, such provision would permit dilatory tactics in representation proceedings.

Id. at 478–79 (internal citations and quotations omitted) (emphasis added); see also Blue Cross & Blue Shield of Michigan v. NLRB, 609 F.2d 240, 244–45 (6th Cir. 1979) (employer was required to exhaust administrative remedies before seeking judicial review of Board order regarding certification of an election).

Here, Vanderbilt's regulatory challenge does not request this Court review any Board decision pertaining to a representation or election proceeding. Despite the parties' contentions, there is no Board order at issue regarding Vanderbilt's challenge to the Regulations that was allegedly made in excess of its delegated authority such that the Kyne test applies. (Doc. No. 1 ¶¶ 81–83; Doc. Nos. 31, 39). Instead, Vanderbilt asserts that this Court has jurisdiction over a regulatory challenge. This is an issue that cases like Kyne and Boire, as well as the legislative history they rely upon, say nothing about. See generally, Kyne, 358 U.S. 184; Boire, 376 U.S. 473. The absence of such discussion as to whether the NLRA displaces district court jurisdiction

22

over such regulatory challenge claims makes sense considering that Congress passed the APA, which provides Vanderbilt with the grounds to challenge the Regulations, almost 11 years after it enacted the NLRA.  See Pub. L. 75–198, 49 Stat. 449 (1935); Pub. L. 79–404, 60 Stat. 237 (1946).  Perhaps this is why courts like AFL-CIO II, AFL-CIO I, and Chamber of Com. do not address Kyne either—they were all aware of its inapplicability to the challenges to the Board rules at issue.  See generally AFL-CIO II, 57 F.4th 1023; Chamber of Com., 723 F. Supp. 3d 498.[8]  Accordingly, as no final order concerning unfair labor practices is at issue here, nothing in the NLRA, including § 160(f), deprives this Court of jurisdiction over Vanderbilt's challenge to the Regulations.  See AFL-CIO II, 57 F.4th at 1033–34; Chamber of Com., 723 F. Supp. 3d at 511–12.

In sum, as pertaining to Vanderbilt's regulatory challenges, this case properly falls within this Court's 28 U.S.C. § 1331 jurisdiction.[9]  Vanderbilt's assertion that it has federal question jurisdiction is not "specious," as Defendants contend.  (See Doc. No. 31 at 13).  Under 28 U.S.C. § 1331, district courts "shall have original jurisdiction of all civil actions" arising under federal law.  APA actions for review of federal agency rulemaking, such as this one, "arise under" federal law.  See 5 U.S.C. § 702; see also AFL-CIO II, 57 F.4th at 1034 ("Thus, pursuant to 28 U.S.C. § 1331, the district court had jurisdiction over the [plaintiff's] challenge to the [NLRB Rule under

---

[8] For similar reasons, Defendants' reliance on Thunder Basin and Axon to support their contention that this Court does not have jurisdiction over Vanderbilt's regulatory challenges are similarly inapplicable.  Thunder Basin and Axon apply in circumstances that exempt a claim from what would otherwise be encompassed by a statute's "comprehensive review process."  Axon Enterprises, Inc. v. FTC, 598 U.S. 175, 186 (2023) (citing Thunder Basin Coal v. Reich, 510 U.S. 200, 208 (1994)).  The Court has found that Vanderbilt's challenge to the Regulations is not encompassed within § 160(f)'s jurisdictional scheme. Therefore, it need not rely on exceptions to that scheme to establish subject matter jurisdiction.

[9] To the extent Vanderbilt relies on the APA to establish jurisdiction in its Complaint (Doc. No. 1 ¶ 22), Defendants are correct that this is improper.  The APA is not a jurisdictional grant.  See California v. Sanders, 430 U.S. 99, 107 (1977).

the APA] [.]").  Given this Court has determined the NLRA does not displace this Court's jurisdiction over such claims, Defendants cannot credibly argue that this action does not arise under the laws of the United States.  See 28 U.S.C. § 1331.  Accordingly, pursuant to 29 U.S.C. § 1331, this court has jurisdiction over Vanderbilt's challenge to the Regulations.

To be clear, the reasoning above applies only to Vanderbilt's *regulatory* challenge, and does not apply to any challenge to a Board decision made during the election proceeding.  The Court makes this distinction because the references relief concerning the Board's preclusion determination, (Doc. No. 1 at VI ¶ 5 (requesting relief ordering "the Board to reopen the record and permit Vanderbilt to offer evidence and argument on the appropriateness of the proposed election unit," ¶ 6 requesting "[t]emporary and permanent injunctions preventing the Board from taking further action on the petition until the Court resolves this complaint on the merits")), and adjudication of the Subpoenas, (id. at VI ¶ 4 (requesting a judgment "declaring that Vanderbilt must permit the objecting students' formal objections to be adjudicated before it can disclose the information subpoenaed by the Board and protected by FERPA")).  The Court does not have jurisdiction to grant such relief absent a showing by Vanderbilt that its claim can satisfy the Kyne exception.  As Hartz Mountain instructs, courts have found that Board determinations like the preclusion order are not subject to direct judicial review in district courts, absent applicability under Kyne.  Hartz Mountain, 727 F.2d at 1311.  Kyne applies "[o]nly where the Board has clearly violated an express provision of the [NLRA]."  Id. at 1312; see Goethe House New York, German Cultural Ctr. v. NLRB, 869 F.2d 75, 78 (2d Cir. 1989) (citing Kyne, 358 U.S. at 188)).  Because Vanderbilt does not allege that Defendants clearly violated an express provision of the NLRA with

respect to the preclusion decision, it cannot satisfy <u>Kyne</u>.[10]  <u>See id.</u>  Further, to the extent

Vanderbilt seeks relief in reference to the Subpoenas, the NLRA has express provisions governing

those disputes.  As applicable here, 29 U.S.C. § 161(2) provides:

> <u>In case of contumacy or refusal to obey a subpoena issued to any person, any</u>
> <u>district court of the United States</u> or the United States courts of any Territory or
> possession, within the jurisdiction of which the inquiry is carried on or within the
> jurisdiction of which said person guilty of contumacy or refusal to obey is found or
> resides or transacts business, <u>upon application by the Board shall have jurisdiction</u>
> <u>to issue to such person an order requiring such person to appear before the Board,</u>
> <u>its member, agent, or agency, there to produce evidence if so ordered,</u> or there to
> give testimony touching the matter under investigation or in question; and any
> failure to obey such order of the court may be punished by said court as a contempt
> thereof.

29 U.S.C. § 161(2) (emphasis added).  Pursuant to § 161, should the Board seek to enforce the

Subpoenas, it can do so through review in a federal district court.  <u>See id.</u>; <u>see also</u> <u>NLRB v. ITT</u>

<u>Telecommunications</u>, 415 F.2d 768, 769 (6th Cir. 1969) ("[I]n the case of a refusal to obey such a

subpoena, the Board can apply to the appropriate United States District Court for aid in compelling

the production of the documents sought.").  That process would give Vanderbilt a chance to litigate

those disputes.  <u>See</u> 29 U.S.C. § 161(2); <u>see also</u> <u>ITT Telecommunications</u>, 415 F.2d at 769.

---

[10] Defendants also contend Vanderbilt cannot bring these types of claims under <u>Thunder Basin</u> or
<u>Axon</u>, either.  (Doc. No. 31 at 18–20).  Considering Vanderbilt does not respond to these
arguments, the Court believes it concedes as much.  (<u>See generally</u> Doc. Nos. 34, 40).  Still, the
Court finds that to the extent Vanderbilt does rely on those cases to assert this Court has jurisdiction
over these requests for relief, such efforts are unsuccessful because it cannot satisfy the <u>Thunder
Basin</u> factors.  Specifically, Vanderbilt cannot show: precluding district court review would not
foreclose meaningful review for Vanderbilt, as it could obtain judicial review under § 160(f) once
it challenged the preclusion as an unfair labor practice or could address its concerns in a subpoena-
enforcement proceeding; the claim is not "collateral" to the extent Vanderbilt indeed challenges
the actions taken in the current election proceedings, <u>Axon</u>, 598 U.S. at 192; and the Court does
not see the issue of proper preclusion orders or enforcing its own subpoena as beyond the NLRB's
expertise, given, as Defendants emphasize, "Congress has entrusted the Board with a wide degree
of discretion in establishing the procedure and safeguards necessary to insure the fair and free
choice of bargaining representatives by employees."  (Doc. No. 39 at 18 (citing <u>NLRB v. A.J.
Tower Co.</u>, 329 U.S. 324, 330 (1946)).

However, here, the enforcement and validity of the Subpoenas are not before this Court for consideration. Accordingly, to the extent Vanderbilt seeks relief as related to a Board decision in the election proceeding, or as related to the Subpoenas, the Court does not have subject matter jurisdiction to address such issues.

### 2. Whether the NLGA Bars Vanderbilt's Request for Injunctive Relief

The Court now moves to Defendants' alternative argument that the NLGA bars the injunctive relief Vanderbilt seeks. Defendants contend that this Court does not have the authority to enter an injunction or restraining order blocking a union representation proceeding, given that the NLGA prevents courts from issuing such orders "in any case involving or growing out of a labor dispute." (Doc. No. 31 at 10) (internal citation omitted). Defendants assert that because this case "unquestionably" grows out of a labor dispute, the Court cannot enjoin the applicable activity by workers and unions, nor can it enjoin the NLRB from enforcing invalid regulations. (See id. at 10–11). Vanderbilt disagrees, asserting that this case is not a "labor dispute" as contemplated in the NLGA. (Doc. No. 34 at 8). Vanderbilt further contends that the NLGA does not contemplate, let alone prevent, enjoining the NLRB from enforcing invalid regulations, as evidenced by prior cases addressing the issue. (Id. at 11). Again, the Court will first provide some background regarding the NLGA, and then analyze its applicability here.

### a. Relevant Overview of the NLGA

The Court finds little guidance on the NLGA's applicability to regulatory challenges like the one at issue here. The legislative history surrounding the NLGA is therefore a helpful place to start. The NLGA—"considered as a whole and in its various parts—was intended drastically to curtail the equity jurisdiction of federal courts in the field of labor disputes." Milk Wagon Drivers' Union, Loc. No. 753, Int'l Bhd. of Teamsters, Chauffeurs, Stablemen & Helpers of Am. v. Lake

26

<u>Valley Farm Prod.</u>, 311 U.S. 91, 101 (1940).  The Senate Judiciary Committee, reporting on the

NLGA, said:

> That there have been abuses of judicial power in granting injunctions in labor
> disputes is hardly open to discussion. The use of the injunction in such disputes has
> been growing by leaps and bounds. . . For example, approximately 300 were issued
> in connection with the railway shopmen's strike of 1922[.]

<u>Id.</u> at 127–28 (citing S. Rep. No. 163, 72nd Cong., 1st Sess., p. 8.).  The Supreme Court has further

opined that:

> This congressional purpose, as is well known, was prompted by a desire to protect
> the rights of laboring men to organize and bargain collectively and to withdraw
> federal courts from a type of controversy for which many believed they were ill-
> suited and from participation in which, it was feared, judicial prestige might suffer.
> See Frankfurter and Greene, <u>The Labor Injunction</u> (1930), at 200; Gregory, Labor
> and the Law (1958), at 184—199.

<u>Marine Cooks and Stewards</u>, 362 U.S. at 369 n.7.  The NLGA is broad because "Congress was

intent upon taking the federal courts out of the labor injunction business" except for the limited

circumstances left open for federal jurisdiction under the Act.  <u>Marine Cooks & Stewards v.</u>

<u>Panama S.S. Co.</u>, 362 U.S. 365, 369 (1960).

"The legislative history of the [NLGA] demonstrates that it was the purpose of the

Congress further to extend the prohibitions of the Clayton Act respecting the exercise of

jurisdiction by federal courts and to obviate the results of the judicial construction of the [Clayton

Act]." <u>New Negro Alliance v. Sanitary Grocery Co.</u>, 303 U.S. 552, 562 (1938).  The Clayton Act

gave private parties "a right to relief by injunction in any court of the United States against

threatened loss or damage by a violation of the antitrust laws, under the conditions and principles

regulating the granting of such relief by courts of equity." <u>Duplex Printing Press Co. v. Deering</u>,

254 U.S. 443, 465 (1921).  However, it failed to eliminate labor injunctions, given courts narrowly

27

read the Clayton Act as applying only to disputes between employers and employees, but not to all members of a labor organization. Id. at 470–72.

Congress sought to resolve the outcome in Duplex by enacting the NLGA to bar labor injunctions encompassing that secondary union activity. See 29 U.S.C. §§ 104, 113(c); see also 29 U.S.C. §§ 158(b)(4), 160(k), 160(l). The NLGA provides, in pertinent part:

No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

(a) Ceasing or refusing to perform any work or to remain in any relation of employment;

(b) Becoming or remaining a member of any labor organization or of any employer organization, regardless of any such undertaking or promise as is described in section 103 of this title;

(c) Paying or giving to, or withholding from, any person participating or interested in such labor dispute, any strike or unemployment benefits or insurance, or other moneys or things of value;

(d) By all lawful means aiding any person participating or interested in any labor dispute who is being proceeded against in, or is prosecuting, any action or suit in any court of the United States or of any State;

(e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;

(f) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute;

(g) Advising or notifying any person of an intention to do any of the acts heretofore specified;

(h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and

28

(i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified, regardless of any such undertaking or promise as is described in section 103 of this title.

29 U.S.C. § 104 (emphasis added) (listing activities not subject to an injunction). The term "labor dispute" includes:

any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.

29 U.S.C. § 113(c) (emphasis added). By including the language in § 113(c) barring injunctive relief regardless of whether the disputants stood in "proximate relation of employer and employee," Congress sought to undo the judicial interpretation of the Clayton Act in Duplex, and other similar cases, that found secondary activity to not be subject to the injunctive relief bar in the Clayton Act. See Milk Wagon Drivers' Union, 311 U.S. at 103 ("As an example of the judicial interpretation of the Clayton Act which the Committee said was 'responsible in part for this agitation for further legislation,' the Committee referred to the cases of Duplex Printing Press Co. v. Deering, 254 U.S. 443, American Steel Foundries v. Tri-City Central Trades Council, 257 U.S. 184, and Bedford Cut Stone Co. v. Journeyman Stone Cutters' Association, 274 U.S. 37. In these cases, the jurisdiction of the courts to grant injunctions had been upheld upon allegations and findings that the Sherman Anti-Trust Act had been violated.").

Despite Congress' intention to encompass secondary activity within the NLGA's ban on injunctions sought in relation to conflicts growing out of or involving labor disputes, nothing in the NLGA contemplates prohibiting injunctions against a labor agency as related to its own regulations. Section 104 of the NLGA provides a list of activities not subject to an injunction. See 29 U.S.C. § 104(a)–(i). Indeed, as Vanderbilt notes (see Doc. No. 34 at 7), the NLGA bars

29

injunctive relief relating only to specific conduct exercised by workers, including: ceasing or refusing to perform work, id. § 104(a); becoming or remaining a member of a labor organization, id. § 104(b); paying or withholding from persons participating in a strike or labor dispute, id. § 104(c); aiding a person participating in a labor dispute, id. § 104(d); giving publicly to a labor dispute, id. § 104(e); assembling to act or organize, id. § 104(f); advising someone of an intent to do the other acts specified under § 104, id. § 104(g); agreeing with others to not do the acts specified under § 104, id. § 104(h); and advising or urging the acts specified under § 104, id. § 104(i).

> **b.** The NLGA Does Not Apply Because Vanderbilt's Request for Injunctive Relief Does Not Involve or Grow Out of Any Labor Dispute

At the outset, the Court must determine whether this is a "case involving or growing out of any labor dispute" within the meaning of § 104 and § 113(c) of the NLGA. See Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n., 457 U.S. 702, 709 (1982). The "critical element in determining whether the provisions of these provisions of the NLGA apply is whether 'the employer-employee relationship [is] the matrix of the controversy.'" Id. at 712 (citing Columba River Packers Ass'n, Inc. v. Hinton, 315 U.S. 143, 147 (1942)). It therefore reasons that the term labor dispute "does not include controversies upon which the employer-employee relationship has no bearing." Int'l Union United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Lester Eng'g Co., 718 F.2d 818, 823 (6th Cir. 1983).

Defendants, despite asserting that this case "unquestionably" involves and grows out of a labor dispute, do not tell the Court what that labor dispute is. (Doc. No. 31 at 10–11). Instead, they imply (through emphasis in their briefing), that the supposed labor dispute involves and grows out of a controversy concerning the representation of persons in "negotiating, fixing, maintaining, changing, or seeking to arrange the terms or conditions of employment." (Id. (citing 29 U.S.C. §

30

113)). Further missing from Defendants' briefing is what act is at issue under § 104 that would be improperly subject to injunctive relief, should the Court issue a preliminary injunction on Vanderbilt's behalf. (See Doc. No. 31 at 10–11). Without any guidance to the contrary, the Court presumes Defendants would maintain subsection (b) of § 104 applies here, "[b]ecoming . . . a member of any labor organization[.]" 29 U.S.C. § 104(b).

From what the Court can ascertain, Defendants' contention is that this case arises from a dispute between Vanderbilt, its graduate students, and/or Defendants as to the representation of those graduate students in negotiating or seeking to arrange the terms of their employment. The Court finds that is an incorrect lens through which to view this case. Here, there is no employer-employee relationship within the matrix of controversy such that the NLGA applies. See Jacksonville Bulk Terminals, 457 U.S. at 712. The matrix of controversy is between Defendants' Regulations and Vanderbilt's compliance with FERPA. (See Doc. No. 1 ¶¶ 19–21). The employer-employee relationships that are tangentially related to this proceeding, those between Vanderbilt and its graduate students electing to unionize, have no bearing on the dispute at issue over the validity of the Regulations as applied to Vanderbilt, an institution receiving federal funding and subject to FERPA's requirements. See Int'l Union United Auto., 718 F.2d at 823 ("The test is satisfied where an employer and a union representing its employees are the disputants, and their dispute concerns the interpretation of the collective bargaining agreement that defines their relationship").

The text and legislative history of the NLGA, as well as binding case law interpreting the NLGA, support this conclusion. As to the text of the NLGA, Vanderbilt does not seek relief growing out of a dispute over those graduate students' representation in seeking to arrange or negotiate the terms of their employment. See 29 U.S.C. § 113(c). Nor is Vanderbilt looking to

31

prevent its graduate students from unionizing.  See 29 U.S.C. § 104(b).  In fact, none of the activities listed in § 104(a)–(i) are aimed at preventing an employer, such as Vanderbilt, from prohibiting an agency from enforcing purportedly invalid regulations.  Further, the purpose of the NLGA was to prevent the use of labor injunctions as a means of preventing employees from organizing and bargaining collectively, see Milk Wagon Drivers' Union, 133 U.S. at 127–28; Marine Cooks and Stewards, 362 U.S. at 369 n.7.  Vanderbilt does not seek to prevent its graduate students from organizing and bargaining collectively.  Rather, the Complaint is narrower and not directly related to any potential labor disputes between the parties and Vanderbilt's graduate students that may arise in the future.  Vanderbilt seeks injunctive relief *only* to prevent invalid application of the Regulations considering FERPA.[11]  (See Doc. No. 1 at VI (prayer for relief)).  Further, these circumstances are markedly different from those Defendants rely on where the NLGA applied.  See, e.g., Jacksonville Bulk Terminals, Inc., 457 U.S. at 713 (applying NLGA where employer and the union representing its employees were the disputants, and their dispute concerned "the interpretation of the labor contract that defin[ed] their relationship"); Buffalo Forge Co. v. United Steelworkers of Am., AFL-CIO, 428 U.S. 397, 407, 409–10 (1976) (NLGA applicable where employees were on a sympathy strike despite no-strike language in employment contracts); United Steelworkers of Am., AFL-CIO v. Bishop, 598 F.2d 408, 410, 414 (5th Cir. 1979) (NLGA applied in dispute between striking union, employer, and customer where the injunction was issued for an "exact action prohibited by" the NLGA and the employees were striking concerning terms of employment); see also Columbia River Packers Ass'n v. Hinton, 315 U.S. 143, 147 (1942) (no labor dispute under the NLGA where there underlying dispute did not

---

[11] To the extent Vanderbilt seeks broader relief than what is referred to here, the Court has already determined it does not have subject matter jurisdiction over those requests.  See supra, Section II.A.1.c.

32

"place in controversy the wages or hours or other terms and conditions of employment"); Armco, Inc. v. United Steelworkers of Am., 280 F.3d 669, 680 (6th Cir. 2002) (something grows out of a labor dispute if it "would not exist but for the underlying [Board charges]").

Defendants attempt to escape this legal authority by citing two non-binding district court cases that are readily distinguishable. First, Defendants cite to Nexstar Media, Inc. Grp. v. NLRB, which involved whether the NLRA barred an employer's Seventh Amendment right to jury trial claim against the Board, which had sought legal remedies against the employer for its alleged unfair labor practices. -- F. Supp. 3d --, 2024 WL 4127090, at *3–5 (N.D. Ohio Aug. 26, 2024). The Nexstar court did not reach the merits of this question upon a finding that it did not have subject matter jurisdiction, given the applicability of § 160(f) and the employer's failure to satisfy the Thunder Basin factors. Id. However, the court commented in dicta that the NLGA *may* have barred plaintiff's request for injunctive relief because "the case before it is intended to divert the NLRB's ability to administratively resolve the dispute initiated by [the union]." Id. Defendants rely on this language in asserting the NLGA applies to this case. (Doc. No. 31 at 10 n.10).

Defendants' reliance on Nexstar is misplaced for at least two reasons. First, the union in Nexstar had already filed an unfair labor practice charge against the employer with the Board stemming from the union's allegations that the employer made changes to a union member's employment without bargaining with the union. Nexstar, 2024 WL 4127090, at *1; see also Nexstar Media, Inc. Grp. V. NLRB, Case No. 4:24-cv-01415, Doc. No. 1. While the Court does not contend there must be an unfair labor practice dispute at issue for the NLGA to apply, there are no allegations in this case remotely similar to those in Nexstar such that it would be instructive here. Second, and most importantly, the court did not even "reach th[e] alternative argument" of whether the NLGA barred the plaintiff's request for injunctive relief because it already determined

33

it lacked subject matter jurisdiction. Id. at *5. Therefore, to the extent Defendants rely on the Nexstar court's dicta on the applicability of the NLGA, it holds no water. See Wright v. Spaulding, 939 F.3d 695, 700 (6th Cir. 2019) ("[O]nly *holdings* are binding, not *dicta*."); see also United States v. Burris, 912 F.3d 386, 410 (6th Cir. 2019) (en banc) (Kethledge, J., concurring in the judgment) ("[D]ictum is usually a bad idea, because judges think differently—more carefully, more focused, more likely to think things through—when our words bring real consequences to the parties before us.")

The second case Defendants rely upon, VHS Acquisition Subsidiary No. 7 v. NLRB, et al., 2024 WL 4817175, at *1 (D.D.C. Nov. 17, 2024) ("VHS"), fares no better. There, the union filed a formal charge against the employer before the Board. Id. at *1. The Board subsequently charged the employer with violating various provisions of the NLRA. Id. The employer then filed a lawsuit in the district court requesting that the court halt the impending Board enforcement action related to those charges. Id. The district court rejected such request and found that the proceedings "stem[med] from the Union's charge that [the employer] engaged in unfair labor practices." Id. at *5. The court found that under those circumstances, the "underlying spat" alleging that the employer "retaliated against employees for engaging in protected activity; discriminated regarding the hire, tenure, or terms and conditions of employment to discourage union membership; and failed to bargain collectively in good faith with the [u]nion" clearly grew out of a labor dispute under the NLGA. Id. Again, here, none of those issues are present—there have been no allegations against Vanderbilt for any sort of unfair labor practice, including as relevant here, no assertion that it has "failed to bargain collectively in good faith with" a union. See id. While Defendants contend this is merely because the current status of the proceedings (see Doc. No. 43-3 at 3), the Court finds no facts inferring there is a dispute between the parties and relevant third parties that

34

resembles the one in <u>VHS</u>. The Court therefore finds Defendants' reliance on <u>VHS</u> at best unpersuasive, and at worst, irrelevant.

The Court is more persuaded by the cases cited in Vanderbilt's brief (Doc. No. 34 at 12–13), and, in those cases, the NLGA did not serve as an impediment to the Court's jurisdiction. <u>See</u> <u>AFL-CIO II</u>, 57 F.4th at 482–83, 499 (affirming lower court's determination that it had jurisdiction over plaintiff's challenge to NLRB rules under the APA, and leaving in place the lower court's vacatur of three improper rules); <u>Chamber of Com.</u>, 723 F. Supp. 3d at 513, 518–19 (concluding the court had jurisdiction to vacate invalid proposed NLRB regulation). The Court acknowledges the issue of the NLGA was not presented in those cases, and the courts in those cases vacated the NLRB regulations at summary judgment. Still, these cases remain persuasive authority on the NLGA's inapplicability here for two reasons. First, courts may issue injunctive relief to enforce a declaratory judgment, such as the ones issued in <u>AFL-CIO II</u> and <u>Chamber of Com.</u>, "should the defendants threaten to depart" from the judgment. <u>Chamber of Com.</u>, 723 F. Supp. 3d at 519; <u>see</u> 28 U.S.C. § 2202 ("Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against an adverse party whose rights have been determined by such judgment."); <u>Powell v. McCormack</u>, 395 U.S. 486, 499 (1969) ("A declaratory judgment can [] be used as a predicate to further [declaratory] relief, including an injunction."). Second, courts have a continuing obligation to ensure they have subject matter jurisdiction. <u>See</u> <u>Campanella v. Com. Exch. Bank</u>, 137 F.3d 885, 890 (6th Cir. 1998) ("federal courts have a continuing obligation to inquire into the basis of subject-matter jurisdiction to satisfy themselves that jurisdiction to entertain an action exists"); <u>see also</u> Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). Surely, if the courts in <u>AFL-CIO II</u> or <u>Chamber of Com.</u> suspected the NLGA was an

impediment to enforcing the declaratory relief granted in those circumstances, they would have said as much.[12]  Accordingly, considering the text, structure, and legislative history of the NLGA, as well as prior precedent, the Court finds the NLGA's prohibitions on courts granting injunctive relief are not applicable to this action because the narrow dispute presented by Vanderbilt as to the validity of the Regulations under the APA did not involve or grow out of a labor dispute.[13]

### 3.  Whether Vanderbilt Has Article III Standing

Having concluded that the Court has jurisdiction over Vanderbilt's challenge to the Regulations, it now moves to whether Vanderbilt has standing to bring suit.  Defendants contend that Vanderbilt does not allege facts showing an Article III injury that is plausible on its face, as its purported threat of losing federal funding is too speculative and conjectural.  (Doc. No. 39 at 18–19).  Vanderbilt disagrees, asserting that FERPA "explicitly penalizes noncompliance by stripping federal funds," and it may therefore bring this conflict to federal court given it has been "forced to choose between surrendering their funding and following an agency command[.]"  (Doc. No. 40 at 6).

A motion to dismiss for lack of standing is properly characterized as a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  See Stalley v. Methodist Healthcare, 517 F.3d 911, 916 (6th Cir. 2008) (referring to a "lack of standing" as a "lack of subject matter jurisdiction").  "[T]he irreducible constitutional minimum of standing

---

[12] Vanderbilt references various out-of-circuit district court cases granting injunctive relief pertaining to Board proceedings.  (Doc. No. 40 at 8 (citing SpaceX Expl. Technolo-Gies Corp. v. NLRB, 2024 WL 3512082, at *1 (W.D. Tex. July 23, 2024)).  Like the district court cases Defendants rely upon, the Court is not convinced of the persuasiveness of these decisions and need not rely on them here.

[13] Because the Court finds the NLGA is not applicable here, it need not address Defendants' argument that Vanderbilt failed to comply with Regulations, precluding relief even where injunctions are permitted under the NLGA.  (See Doc. No. 31 at 11).

36

contains three elements." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016) (internal citations omitted). The plaintiff has the burden of satisfying all three prongs "separately for each form of relief sought." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 185 (2000). The Court understands Defendants only contest the first prong of Vanderbilt's Article III standing. (See Doc. No. 39 at 18–19). However, as part of its continuing obligation to ensure it has subject matter jurisdiction, the Court will independently evaluate all three standing prongs here. See Campanella, 137 F.3d at 890.

a. The First Prong of Standing: An Injury in Fact

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, 578 U.S. at 339 (quoting Lujan, 504 U.S. at 560). For the following reasons, the Court finds that Vanderbilt has sufficiently carried its burden of establishing each of these three elements to satisfy the first prong of standing. See Rogers, 798 F.2d at 915.

The first element, that Vanderbilt has a legally protectable interest, is present. Vanderbilt has established that it has a legally protected interest in complying with its obligations under FERPA, given it is a university that accepts federal funding (see Doc. No. 1 ¶ 26). See Spokeo, 578 U.S. at 339. It also has sufficiently established Defendants have invaded that right by forcing Vanderbilt to comply with the Regulations and risk a loss of funding under FERPA, or not comply with the Regulations and face punishment during the election proceedings (see Doc. No. 1 ¶¶ 25–32). See Spokeo, 578 U.S. at 339.

37

The next question in evaluating the first prong of the standing analysis, whether Vanderbilt has alleged harms that are "actual or imminent" and "concrete and particularized," is murkier. See Spokeo, 578 U.S. at 339. Under some circumstances, standing "can derive from an imminent, rather than an actual, injury, but only when 'the threatened injury is real, immediate, and direct.'" Crawford v. U.S. Dep't of the Treasury, 868 F.3d 438, 454 (6th Cir. 2017) (quoting Davis v. FEC, 554 U.S. 724, 734 (2008)).

Where a plaintiff alleges injunctive or declaratory relief, "an allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) (internal citation and quotation omitted). Such relief may also be supported by allegations of a past injury that has "continuing, present adverse effects." Sullivan v. Benningfield, 920 F.3d 401, 408 (6th Cir. 2019). And "even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement," "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Duke Power Co. v. Carolina Env't. Study Grp., Inc., 438 U.S. 59, 80 (1978) (internal citation and quotation omitted).

While Vanderbilt now contends that it is injured "not by the election proceeding itself," but rather "the threat to Vanderbilt's federal funds," (Doc. No. 40 at 5), the Complaint cannot be read so narrowly. Indeed, as Defendants note, the Complaint asserts that as a result of the invasion of its legal obligations under FERPA, it "will be barred from effectively contesting the unit's scope" and will be forced to "face an unfair labor practice charge from the Board" to get direct judicial review of the Board's preclusion determination. (Doc. No. 1 ¶ 16). As the Court has already determined, the Court does not have jurisdiction to address such harms. See supra, Section II.A.1.c.

However, the Court does have jurisdiction over Vanderbilt's challenge to the Regulations to the extent it seeks narrower relief for its actual harms during the election process that are continuing and pervasive, but outside the NLRB's scope of authority. (See Doc. No. 1 at VI ¶¶ 1–3, 7 (seeking relief in relation to the Regulations as applied to Vanderbilt, but not requesting judgments or injunctive relief in the purview of the NLRB)). Vanderbilt alleges that the Regulations have already been applied to it in the election proceedings in a manner that is inconsistent with FERPA, the adverse effects of which continue to pervade beyond the Board's preclusion determination. See Sullivan, 920 F.3d at 408. In particular, Vanderbilt alleges that "[b]ecause of the NLRB's application of its regulations, Vanderbilt now faces a representation petition for a unit of 2,700 graduate students," (Doc. No 1 ¶ 14), which it contends is inappropriate. Going forward, Vanderbilt is forced to proceed with a proposed union unit that it has no way of properly contesting, demonstrating that the application of the Regulations to it have continuing, pervasive effects on Vanderbilt in the election proceeding such that it has standing to seek the injunctive and declaratory relief it requests here. See Sullivan, 920 F.3d at 408.

These are not the only harms Vanderbilt alleges. The Complaint further states that by Vanderbilt being forced to comply with either the Regulations or FERPA, it risks losing its federal funding as the election proceeds (Doc. No. 1 ¶ 15). See Driehaus, 573 U.S. at 158. Defendants contend that Vanderbilt's risk of losing federal funding is "speculative" or "conjectural." (See Doc. No. 39 at 18–19). The Court disagrees. Vanderbilt has alleged that it faces a real, immediate, and direct risk of violating FERPA as the election proceedings continue, as it will be forced to decide whether to violate FERPA or the Regulations once an election is ordered and Vanderbilt is ordered to disclose FERPA-protected student information in a voter list, (Doc. No. 1 ¶¶ 13, 17, 31). See Crawford, 868 F.3d at 453; see also State of Tennessee v. Dep't of Educ., 104 F.4th 577,

590 (6th Cir. 2024) ("a party may establish imminence with 'an adequate showing that sometime in the relatively near future' it will 'continue' an action that 'allegedly violates the law'"). Should Vanderbilt violate its students' rights under FERPA by disclosing their protected information in its voter list, its harm will be imminent: Vanderbilt will be at immediate risk of a student complaining to the Department of Education of its practice of unlawful disclosures during such proceedings. See Crawford, 868 F.3d at 453. The real risk of such a complaint materializing is evidenced by Vanderbilt's allegations that two students have filed an emergency appeal with the Board seeking to stay enforcement of the Subpoena, and more than 80 students have affirmatively objected to the disclosure of their information in response to the Subpoena. (Doc. No. 1 ¶¶ 58, 68). Further, this harm is particularized to Vanderbilt. It does not seek redress for "every citizen's interest in proper application" of FERPA, Crawford, 868 F.3d at 453, but instead, only as applied to Vanderbilt. (See Doc. No. 1 at VI (prayer for relief requesting relief only as applied to Vanderbilt)). Accordingly, the Court finds that Vanderbilt has alleged continuing and adverse effects of past harm and substantial risk that it is likely to suffer future harm if it remains subject to the Regulations as currently applied to it to satisfy the first prong of Article III standing. See Driehaus, 573 U.S. at 158; see also Organized Vill. of Kake v. U.S. Dep't of Agric., 795 F.3d 956, 965 (9th Cir. 2015) (threatened "loss of funds promised under federal law" satisfies "Article III's standing requirement").

### b. The Second Prong of Standing: Causation

To establish the second prong of standing, causation, a plaintiff must demonstrate a "causal connection between the injury and the conduct complained of." Durham v. Martin, 905 F.3d 432, 434 (6th Cir. 2018) (internal citation and quotations omitted). But the defendant's conduct need not have a "close connection" to the plaintiff's injury; rather, it need only be "fairly traceable" to the alleged injury. Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 133

40

(2014). The plaintiff also must show that the alleged injury is not "th[e] result [of] the independent action of some third party not before the court." Durham, 905 F.3d at 434 (internal citation and quotations omitted).

Here, Vanderbilt has demonstrated a causal connection between its actual and imminent injuries and Defendants' application of the Regulations to satisfy the second prong of standing. First, Vanderbilt has sufficiently alleged facts establishing that its alleged actual injury—i.e. facing a representation petition for a unit of 2,700 graduate students that it has no way of contesting because of its attempt to comply with FERPA (Doc. No. 1 ¶ 14)—is fairly traceable to Defendants' strict enforcement of the Regulations to it. See supra, Section II.A.3.a. Vanderbilt alleges that it attempted to comply with both FERPA and the Regulations in its statement of position, stating: "[b]ecause of Vanderbilt's competing obligations under the NLRB's regulations and FERPA, Vanderbilt complied with the NLRB's regulations and the subpoena by providing the Region [10] and the Union with a redacted form of the requested information" in the Subpoena that "provided as much information as possible while protecting student identities until the student objections could be fully heard." (Doc. No. 1 ¶ 10). Still, Vanderbilt contends that, despite "doing its best to comply with the demands" of both the Regulations and FERPA, "Defendants applied the [Regulations] to penalize Vanderbilt for its approach to student records and its alleged failure to fully comply with the NLRB regulations" by "preclud[ing] [Vanderbilt] from offering evidence or argument on the unit's appropriateness because Vanderbilt had not provided the information required" in its statement of position. (Id. ¶¶ 14, 67). As a result, Vanderbilt asserts it has been injured because it "faces a representation petition for a unit of 2,700 graduate students" and "has been barred from offering evidence or argument about what that unit is inappropriate[.]" (Id. ¶ 14). There is at least a fairly traceable connection between this injury and Defendants'

41

enforcement of the Regulations (particularly with respect to the preclusion order during the election proceedings).  See Durham, 905 F.3d at 434; Lexmark, 572 U.S. at 133.

The outcome is the same for Vanderbilt's imminent injury, namely that it risks a loss of federal funding moving forward in the proceedings.  See supra, Section II.A.3.a.  As to this injury, Vanderbilt alleges that "[i]f and when an election is ordered, Vanderbilt will be required to disclose FERPA-protected student information in a voter list, which is required to be provided to the NLRB and the Union once an election is ordered." (Doc. No. 1 ¶ 17).  According to Vanderbilt, this voter list includes FERPA-protected information such as "personal phone numbers, personal email addressed (when available), work locations, shifts, and job classifications[.]"  (Id. ¶ 41). Vanderbilt further alleges that if it fails to comply with the Regulations as to the voter list information, "the [R]egulations automatically preclude a respondent from asserting its rights under the NLRA[.]" (id. ¶ 12), and that if it "capitulates to Defendants and complies with the [NLRB's] [R]egulations, it will place its federal funding in jeopardy" by disclosing FERPA-protected information in its voter list information.  (Id. ¶ 15).  The Court finds these allegations, combined with Vanderbilt's allegations that Defendants previously "applied the NLRB regulations to penalize Vanderbilt" for attempting to comply with FERPA, (id. ¶ 14), demonstrates a causal connection between Defendants' application of the Regulations and Vanderbilt's imminent potential loss of federal funds as the election process continues.  See Durham, 905 F.3d at 434. Vanderbilt has sufficiently alleged facts that fairly trace Defendants' past strict enforcement of the Regulations to Vanderbilt's untenable position of either complying with the voter list information requirements or risking loss of its federal funding in the future.  See Lexmark, 572 U.S. at 133 (plaintiff's injury need not have a "close connection" to Defendants' conduct).  Accordingly, Vanderbilt it has satisfied the second prong of Article III standing for its imminent injury.

c.  The Third Prong of Standing: Redressability

"The third prong of the Article III standing test is redressability, i.e. the relief the plaintiff is seeking must provide redress for the injury." Parsons v. U.S. Dept. of Justice, 801 F.3d 701, 715 (6th Cir. 2015).  A plaintiff's injury is redressable if a court order provides "substantial and meaningful relief." Larson v. Valente, 456 U.S. 288, 243 (1982).  "'[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself.  He need not show that a favorable decision will relieve his *every* injury.'" Parsons, 801 F.3d at 715 (quoting Larson, 456 U.S. at 244 n.15).  When evaluating redressability, the relevant standard is likelihood, in that "whether it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" Id. at 715 (quoting Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 181 (2000).

Vanderbilt has requested several forms of relief, including: (1) "[a]n order declaring unlawful and setting aside the NLRB's regulations at 29 C.F.R. § 102.63(b)[(1)](i)(C), 102.66(d), and 102.67(l) as inconsistent with FERPA as applied to Vanderbilt, 20 U.S.C. § 1232g;" (2) "[a]n order directing Defendants not to apply those regulations to Vanderbilt to the extent the regulations would require Vanderbilt to disclose information from educational records in a manner inconsistent with FERPA;" (3) "[a]n order forbidding Defendants from applying the regulations to prejudice or prevent Vanderbilt from exercising its rights in the representation-petition process, including, but not limited to, presenting evidence in support of its position during a representation case hearing and requiring Vanderbilt to provide a voter list absent appropriate FERPA processes and protections;" (4) "[a] judgment declaring that Vanderbilt must permit the objecting students' formal objections to be adjudicated before it can disclose the information subpoenaed by the Board and protected by FERPA;" (5) "[t]emporary and permanent injunctions ordering the Board to reopen the record and to permit Vanderbilt to offer evidence and argument on the appropriateness

43

of the proposed election unit;" (6) "[t]emporary and permanent injunctions preventing the Board from taking further action on the petition until the Court resolves this complaint on the merits; and" (7) "[a]lternatively, an order for the Board to proceed with a FERPA-compliant process, including notice and an opportunity to object for affected students." (Doc. No. 1 at VI). To the extent that the Court has determined that it has subject matter jurisdiction to grant such relief, see supra, Section II.A.1.c., the Court finds Vanderbilt's injuries are redressable here.

Vanderbilt's first injury, that it continues to suffer from harms stemming from Defendants' application of the Regulations in the election proceedings, see supra, Section II.A.3.a, will likely be remedied by a favorable decision here. See Laidlaw, 528 U.S. at 181. Although the Court does not have subject matter jurisdiction to grant Vanderbilt declaratory or injunctive relief as to the past harms done to Vanderbilt during the election proceedings (see, e.g., Doc. No. 1 at VI ¶ 4), and so its harm as to the scope of the representation petition will not be fully addressed, that is not what is required to satisfy the redressability prong. Parsons, 801 F.3d at 716. Rather, "partial redress can also satisfy the standing requirement." Id. As the Supreme Court in Laidlaw opined, "[i]t can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of a suit, a sanction that effectively abates that conduct and prevents it recurrence provides a form of redress." Laidlaw, 528 U.S. at 185–86. An order declaring the Regulations unlawful as applied to Vanderbilt, directing Defendants not to apply the Regulations in a manner that violates FERPA, or requiring Defendants to proceed with a FERPA-compliant process would abate Defendants' enforcement of the Regulations during the election proceeding moving forward (Doc. No. 1 at VI ¶¶ 1, 2, 7). See Parsons, 801 F.3d at 716–17; see also Laidlaw, 528 U.S. at 185–86.

The same is true for Vanderbilt's alleged imminent injury as to its potential loss of federal funding. See supra, Section II.A.3.a. Vanderbilt would obtain "substantial and meaningful relief" for this injury if the Court were to, for example: declare 29 C.F.R. § 102.67(l) unlawful as applied to Vanderbilt (Doc. No. 1 at VI ¶ 1); order Defendants to not apply 29 C.F.R. § 102.67(l) to Vanderbilt in a manner that is inconsistent with FERPA (id. at VI ¶ 2); order Defendants to not apply 29 C.F.R. § 102.67(l) in a means that prejudices Vanderbilt (id. at VI ¶ 3); or order Defendants to apply 29 C.F.R. § 102.67(l) in a FERPA-compliant fashion (id. at VI ¶ 7). See Larson, 456 U.S. at 243. By providing any of those forms of relief sought in the Complaint, Vanderbilt would not be forced to choose between complying with the Regulations or FERPA as it moves forward in the election proceedings, relieving it of its threatened injury to its federal funding. See id. at 244 n.15; see also Parsons, 801 F.3d at 715. This demonstrates Vanderbilt's future injury would quite likely be redressed by a decision in its favor. See Laidlaw, 528 U.S. at 181. Accordingly, the Court finds that Vanderbilt has satisfied the third prong of Article III standing. Vanderbilt has standing pursue its APA claim tied to its requests for declaratory and injunctive relief unrelated to the preclusion order and Subpoenas in the Board proceedings. [14]

B. Merits of Vanderbilt's Request for Preliminary Injunction

Having concluded that the Court has subject matter jurisdiction and Vanderbilt has standing, it must now turn to the merits of Vanderbilt's request for preliminary injunctive relief. Vanderbilt seeks an order enjoining Defendants from enforcing the Regulations against them. (Doc. No. 40 at 2). On the other hand, Defendants move to dissolve the TRO under Rule 65(b)(4) and oppose Vanderbilt's motion for a preliminary injunction. (See Doc. Nos. 30, 31). To the

_____

[14] It is hard to see how if the plaintiffs in AFL-CIO II, 57 F.4th 1023, and Chamber of Com., 723 F. Supp. 3d 498, had standing to bring facial regulatory challenges under the APA, Vanderbilt would not also have standing to pursue such as-applied claims here, given it is already experiencing the alleged conflict between the Regulations and FERPA.

45

extent Defendants' Motion to Dissolve seeks to dissolve the temporary restraining order of October 30, 2024 (Doc. No. 15), that issue is now moot (Doc. Nos. 33, 51). However, to ensure all parties are fully heard, the Court has considered Defendants' arguments in their Motion to Dissolve as related to Vanderbilt's motion. Upon consideration of the entire record, the Court concludes that immediate injunctive relief should issue.

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." Overstreet v. Lexington-Fayette Urban Cnty. Gov't, 305 F.3d 566, 573 (6th Cir. 2011). Ultimately, whether to grant an injunction is within the discretion of the district court. Tenn. Scrap Recyclers Ass'n v. Bredesen, 556 F.3d 442, 447 (6th Cir. 2009). The Court considers four factors when evaluating a request for preliminary injunction: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to the opposing party or others; and (4) whether the public interest would be served by the issuance of the injunction." Daunt v. Benson, 956 F.3d 396, 406 (6th Cir. 2020) (citing Bays v. City of Fairborn, 688 F.3d 814, 818–19 (6th Cir. 2012)) (internal quotations omitted); see also Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). The third and fourth factors, harm to the opposing party and the public interest, "merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009). "These factors are not prerequisites but are factors that are to be balanced against each other." Jones v. Caruso, 569 F.3d 258, 265 (6th Cir. 2009). However, "even the strongest showing on the other three factors cannot 'eliminate the irreparable harm requirement.'" D.T. v. Sumner Cnty. Schs., 942 F.3d 324, 326–27 (6th Cir. 2019) (quoting Friendship Materials, Inc. v. Mich. Brick,

<u>Inc.</u>, 679 F.2d 100, 105 (6th Cir. 1982)). The Court will discuss each preliminary injunction factor in turn.

1. <u>Vanderbilt Is Likely to Succeed on the Merits of Its Claim.</u>

The first factor, whether Vanderbilt has a strong likelihood of success on the merits, weighs in favor of issuing injunctive relief. <u>See Daunt</u>, 956 F.3d at 406. Vanderbilt asserts that, as applied, the Regulations are "not in accordance with the law[.]" (Doc. No. 12 at 12). Vanderbilt argues that the Regulations "irreconcilably contradict" FERPA by requiring Vanderbilt to disclose personally identifiable information of students protected by FERPA and penalizing it if it does not do so. (<u>Id.</u> at 12–13). Vanderbilt asserts that because the Regulations contradict federal law, they are invalid. (<u>Id.</u> at 13). Vanderbilt further reasons that the Regulations are arbitrary, capricious, and in excess of the NLRB's statutory jurisdiction pursuant to 5 U.S.C. §§ 706(2)(A) and (C). (<u>See</u> Doc. No. 1 ¶¶ 71–77). As to Vanderbilt's claim that the NLRB acted in excess of its statutory jurisdiction, under 5 U.S.C. § 706(2)(C), the APA prohibits agencies from taking action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" The propriety of agency action has been traditionally evaluated under the two-step framework set forth in <u>Chevron, U.S.A., Inc. v. Natural Resources Defense Counsil, Inc.</u>, 467 U.S. 837, 104 (1984). <u>Tennessee Hosp. Ass'n v. Azar</u>, 908 F.3d 1029, 1037 (6th Cir. 2018). The validity of this test has come into question given the Supreme Court's recent ruling in <u>Loper Bright Enterprises v. Raimondo</u>, 144 S.Ct. 2244 (2024). However, the Court need not grapple with these issues because Vanderbilt is likely to succeed on its claim that the Regulations, as applied to it here, are not in accordance with the law under 5 U.S.C. § 706(2)(A).[15]

---

[15] Further, the Court need not address Vanderbilt's arguments that the Regulations are arbitrary and capricious under 5 U.S.C. § 706(2)(A) for the purposes of this motion for the same reason. (<u>See</u> Doc. No. 12 at 15–18 (Vanderbilt asserting that the Regulations are arbitrary and capricious

Somewhat shockingly, Defendants do little to respond to Vanderbilt's arguments on how the Regulations conflict with FERPA. (See Doc. No. 31 at 15–16, 20–25 (not discussing the merits of Vanderbilt's claim); Doc. No. 39 at 19–25 (same)). Instead, Defendants contend that requiring it to take a conclusive position here would "improperly prejudge" the dispute between Defendants and Vanderbilt as to the preclusion determination. (Doc. No. 43-3 at 4; see Doc. No. 35 at 3 n.3). Where Defendants do attempt to respond, (see Doc. No. 35 at 4 (addressing this factor in one sentence, stating Vanderbilt "has not" shown a likelihood of success on the merits); Doc. No. 39 at 14 n.12, 15 n.13, 19 n.16), they do so in "a most skeletal way, leaving the court to . . . put flesh on its bones." McPherson v. Kelsey, 125 F.3d 989, 995–96 (6th Cir. 1997). Whatever Defendants' reason may be for failing to properly address the merits of Vanderbilt's claim, their silence is telling. Defendants' meager opposition further demonstrates Vanderbilt is likely to succeed on the merits of its claim.

As to the merits, Vanderbilt asserts Defendants' application of the Regulations to it is not in accordance with the law pursuant to 5 U.S.C. § 706(2)(A) of the APA. The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." Franklin v. Massachusetts, 505 U.S. 788, 796 (1992). The APA provides that "courts should set aside any agency decision" that is "'not in accordance with law.'" Chamber of Com. of United States v. Sec. & Exch. Comm'n, 115 F.4th 740, 750 (6th Cir. 2024) (quoting 5 U.S.C. § 706(2)(A)). This "means, of course, *any* law, and not merely those laws that the agency itself is charged with administering." FCC v. NextWave Pers. Commc'ns., Inc., 537 U.S. 293, 300 (2003) (citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 413–14 (1971)).

_____

because "they force disclosure even when no exception applies[,]" "do not provide adequate processes for addressing student objections," and "do not provide any protection from redisclosure of student information," among other things.)).

48

In making this assessment, a court "is not limited to determining whether an agency's decision was 'reasonable' in light of the law as it existed at the time of its decision; instead, the APA requires a court to determine whether a decision is 'in accordance with the law' as it exists at the time of review in the absence of explicit direction to the contrary by Congress." Georgetown Univ. Hosp. v. Bowen, 698 F. Supp. 290, 297 (D.D.C. 1987), aff'd, 862 F.2d 323 (D.C. Cir. 1988). A court should vacate a challenged regulation if it "involve[s] a clear and prejudicial violation of applicable statutes or regulations." McDonald Welding v. Webb, 829 F.2d 593, 595 (6th Cir. 1987).

The Court finds that Vanderbilt is likely to succeed on its claim that Defendants are applying the Regulations to Vanderbilt in a manner that is not in accordance with the law, particularly because their application of the Regulations directly conflicts with Vanderbilt's FERPA obligations. As discussed above, see supra, Section II.A.1.b, the Regulations provide that: (1) an employer's statement of position, such as Vanderbilt's, must contain "a list of the full names, work locations, shifts, and job classifications of all individuals in the proposed unit," see 29 C.F.R. § 102.63(b)(1)(i)(C); (2) if a party fails to "timely furnish the lists of employees" described in § 102.63(b)(1)(i)(C), the employer is "precluded from contesting the appropriateness of the proposed unit" and "from contesting the eligibility or inclusion of any individuals at the pre-election hearing, including by presenting evidence or argument, or by cross-examination of witnesses[,]" see id. § 102.66(d); and (3) absent extraordinary circumstances, an employer must provide the Regional Director, within 2 business days after the issuance of direction, "a list of the full names, work locations, shifts, job classifications, and contact information (including home addresses, available personal email addresses, and available home and personal cellular "cell" telephone numbers) of

49

all eligible voters[,]" see id. § 102.67(l).  However, Vanderbilt must comply with FERPA, and 20

U.S.C. § 1232g(b)(1) provides that, absent exception to disclosure under particular circumstances,

> No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein other than directory information, as defined in paragraph (5) of subsection (a) of students without the written consent of their parents to any individual, agency, or organization[.]

For the purposes of § 1232g(b)(1), the term "education records" means:

> except as may be provided otherwise in subparagraph (B), those records, files, documents, and other materials which— (i) contain information directly related to a student; and (ii) are maintained by an educational agency or institution or by a person acting for such agency or institution.

20 U.S.C. § 1232g(a)(4).  The term "educational agency or institution" means "any public or private agency or institution which is the recipient of funds under any applicable program."  20 U.S.C. § 1232g(a)(3).  "Directory information" is defined as:

> A) For the purposes of this section the term "directory information" relating to a student includes the following: the student's name, address, telephone listing, date and place of birth, major field of study, participation in officially recognized activities and sports, weight and height of members of athletic teams, dates of attendance, degrees and awards received, and the most recent previous educational agency or institution attended by the student.

> (B) Any educational agency or institution making public directory information shall give public notice of the categories of information which it has designated as such information with respect to each student attending the institution or agency and shall allow a reasonable period of time after such notice has been given for a parent to inform the institution or agency that any or all of the information designated should not be released without the parent's prior consent.

20 U.S.C. § 1232g(a)(5).

Here, the Court finds Vanderbilt is likely to succeed in showing that the FERPA protections and prohibitions apply to the student information that the Regulations require be disclosed.[16] As an initial matter, Defendants do not dispute that Vanderbilt is an educational institution under of FERPA. (See Doc. No. 1 ¶¶ 12, 18, 52). Next, the Court finds that the information the Regulations demand Vanderbilt provide in its statement of position to avoid preclusion, as well as voter list, is related to students and maintained by Vanderbilt such that it constitutes education records or personally identifiable information contained therein, see 20 U.S.C. § 1232g(a)(4). (Doc. No. 1 ¶ 17 ("If and when an election is ordered, Vanderbilt will be required to disclose FERPA-protected student information in a voter list[.]"), ¶ 41 ("The respondent must then give the petitioner a final voter list. This list includes the employees' personal information, including personal phone numbers, personal e-mail addresses (when available), work locations, shifts, and job classifications; for students, this information is protected by FERPA."), ¶ 56 ("The information requested in the Subpoena is maintained in Vanderbilt's students' education records and [is] thus FERPA-protected.")).[17] Further, Vanderbilt has shown that this information, such as work

---

[16] The parties' briefing provides no argument as to whether the disclosures discussed here would constitute "a policy or practice of permitting" the release of educational records or personally identifiable information contained therein, as required to be subject to the loss of federal funding under 20 U.S.C. § 1232g(b)(1). Given Defendants' failure to fulsomely address this point, (see Doc. No. 39 at 19 n.16), whatever their rationale may be, the Court finds Defendants waived any such opposition for the purposes of resolving the motion here. See Humphrey v. United States Att'y Gen.'s Office, 279 F. App'x 328, 331 (6th Cir. 2008) (stating that where party failed to respond to argument, any opposition was waived). In any event, the Court finds Vanderbilt has sufficiently proven that, were the Regulations to be continuously enforced against it, Vanderbilt would be forced to enact a "policy or practice" of disclosure during election proceedings, as contemplated under FERPA. (See Doc. No. 40 at 7 asserting Vanderbilt faces an "endless cycle" of providing FERPA-protected information "election after election")).

[17] Defendants question whether the voter list information at issue qualifies as an "educational record" under FERPA. (Doc. No. 39 at 15 n.13). Specifically, Defendants contend Vanderbilt has not established that "the relevant employees whose records are subject to the subpoena are

51

locations, shifts, job classifications, and personal email addresses are not "directory information" that is subject to disclosure under FERPA, see 20 U.S.C. § 1232g(a)(5). (Doc. No. 40 at 11 (information not part of Vanderbilt's list of "directory information")). To the extent Defendants attempt to dispute these points through vague footnotes quoting FERPA's language, such arguments are not supported by facts or analysis that aid the Court in finding in its favor. See Little v. Cox's Supermarkets, 71 F.3d 637, 641 (7th Cir. 1995) (district courts are not required to "scour the party's various submissions to piece together appropriate arguments"); see also InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989) (courts are not obligated to "wade through and search the entire record" for facts that might support a party's position).

Most tellingly, Defendants do not dispute that Vanderbilt's obligation under FERPA to refrain from disclosure of the FERPA-protected information at issue conflicts with the Regulations. While FERPA prevents educational institutions like Vanderbilt from disclosure of non-directory information, see 20 U.S.C. § 1232g(b)(1), the Regulations require Vanderbilt to disclose such information, see 29 C.F.R. § 102.63(b)(1)(i)(C), § 102.66(d). If educational institutions fail to do so in their statement of position, they are precluded from contesting the appropriateness of the proposed unit and the eligibility or inclusion of individuals at the pre-election hearing. 29 C.F.R. § 102.66(d). That is exactly what happened here, when Vanderbilt was precluded from offering evidence because it did not comply with the Regulations, despite Vanderbilt's assertions that it could not do so because some graduate students objected to the

---

'employed as a result of [their] status as a student' under 34 C.F.R. § 99.3(b)(3)(ii), nor that these records do not 'relate exclusively to such person in that person's capacity as an employee.'" (Id.) (internal citation omitted). While Vanderbilt has not presented any evidence on these points, Defendants have not either. Accordingly, given there is no evidence on the record disproving Vanderbilt's allegations that the records at issue are maintained as educational records, the Court gives Defendants' skeletal argument little weight.

disclosure of such information under FERPA.[18] (Doc. No. 1 ¶¶ 67, 69; Doc. No. 27-5 at 133, 205:5–14; Doc. No. 27-6 at 649:11–650:3; Doc. No. 27-7 at 655, 680:1–7; Doc. No. 29 at 28:23–29:2). Further, Vanderbilt asserts it will be placed in the same position as it was with the preclusion decision if and when it must produce a voter list. (Doc. No. 1 ¶¶ 13, 17). Should Vanderbilt disclose such protected information then, nothing in the Regulations prohibits those receiving that information in the election process from further disclosure. See 29 C.F.R. §§ 102.63(b)(1)(i)(C), 102.67(l). Accordingly, Defendants' application of the Regulations, as applied to Vanderbilt, is in clear conflict with the obligations Vanderbilt is required to carry out under FERPA. See McDonald Welding, 829 F.2d at 595.

The conflict between the Regulations and FERPA is substantial. Although the Regulations undoubtedly have application outside of the instant context, here, Vanderbilt, as an academic institution receiving federal funding, cannot comply with both FERPA and the Regulations as currently written during this election proceeding. The NLRB has acknowledged as much, as its own guidance from its General Counsel clarifies a university's obligations when its Regulations and FERPA conflict.[19] See Jennifer A. Abruzzo, Clarifying Universities' and Colleges' Disclosure

_____

[18] These circumstances suggest that even if Defendants adequately contested Vanderbilt's claim pursuant to FERPA's subpoena exception, such argument would likely fail. Defendants' strict application of the Regulations here likely conflicts with the FERPA subpoena exception that allows Vanderbilt to disclose FERPA-protected information pursuant to a lawfully-issued subpoena so long as it makes a reasonable effort to notify affected students so they can "seek protective action." 34 C.F.R. §§ 99.30, 99.31. Here, Vanderbilt is likely to succeed in showing Defendants gave Vanderbilt no significant opportunity to allow its students to seek protective action in response to the Subpoena before mandating Vanderbilt's disclosure under the Regulations. (See Doc. No. 27-6 at 649:11–650:3; Doc. No. 39-2 at 2; Doc. No. 39-3 at 1; Doc. No. 39-4).

[19] It is telling that Defendants have provided no evidence indicating it made a meaningful effort to agree with Vanderbilt "over an accommodation" to honor Vanderbilt's FERPA concerns, as the NLRB's General Counsel recommends the parties do. GC 24-06 at 5. Rather, the record of the

*Obligations under the National Labor Relations Act and the Family Educational Rights and Privacy Act*, Office of the General Counsel Memorandum GC 24-06 (August 6, 2024) ("GC 24-06") (stating that the memorandum "provides guidance clarifying the requirements of NLRA and FERPA in cases involving the duty to furnish [student] information where both statutes may be implicated"). The NLRB's guidance goes so far as to give instructions on how to "[f]acilitat[e] the [c]onsent [p]rocess" that would "would permit an institution covered by FERPA to disclose to a union, consistent with FERPA, any employment-related records of a student that are relevant and reasonably necessary and for each stage of the representation process[.]" Id. at 4–5.

Despite the NLRB's desires to enforce its Regulations, "a valid statute always prevails over a conflicting regulation," Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Gonzales, 468 F.3d 826, 829 (D.C. Cir. 2006), and a regulation can never "trump the plain meaning of a statute," Alt. City Elec. Co. v. FERC, 295 F.3d 1, 11 (D.C. Cir. 2002). See Texas v. EPA, 726 F.3d 180, 195 (D.C. Cir. 2013) (a valid statute always prevails over a conflicting regulation). The Regulations, as applied to Vanderbilt here, do just that—attempt to nullify the plain statutory obligations Vanderbilt is subject to under FERPA. This suggests the Regulations' application here is not in accordance with the law, considering FERPA's superior legal positions to the Regulations. See Dixon v. United States, 381 U.S. 68, 74 (1965) ("The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law.") (internal quotations omitted) (emphasis added); see Nat'l Treasury Emps. Union v. Cornelius, 617 F. Supp. 365, 371 (D.D.C. 1985) ("[T]he law does not permit [an] agency to regulate away" rights and defenses which were "granted by Congress."). Therefore, Vanderbilt

---

proceedings indicates the opposite. (See Doc. No. 27-4 at 20:6–12, 21:24–22:8, 205:24–206:2; Doc. No. 27-5 at 206:4–6; Doc. No. 27-6 at 649:11–650:3; Doc. No. 27-7 at 655, 680:1–7).

54

is likely to succeed on its APA claim that Defendants' application of the Regulations to it are not in accordance with FERPA. Accordingly, this factor weighs in favor of a finding that injunctive relief is appropriate here. See Daunt, 956 F.3d at 406; Jones, 569 F.3d at 265.

### 2. Vanderbilt Faces Irreparable Harm Absent An Injunction

The second factor, whether Vanderbilt will suffer irreparable injury without an injunction, also weighs in favor of issuing the injunction. See Daunt, 956 F.3d at 406. Vanderbilt contends that it faces irreparable injury absent an injunction, because Defendants have forced it to choose between its obligations under FERPA and the Regulations. Further, Vanderbilt asserts it has suffered past harms for non-compliance with the Regulations, and its federal funding would be in jeopardy if it were to disclose that information in compliance with the Regulations.[20] (Doc. No. 40 at 5–7 (citing 20 U.S.C. § 1232g(b)). In its own terms, Vanderbilt asserts "it can avoid one legal wrong only by committing another[.]" (Id. at 6). This is true, so says Vanderbilt, because as the election process plays out, it has been and will be forced to either "forgo its best opportunity to shape the unit determination, or [] disclose information from student records protected by FERPA." (Doc. No. 12 at 21). Defendants contend that Vanderbilt's asserted harms are insufficient, given: (1) there has been "no colorable legal showing that the NLRB's rules were applied to Vanderbilt in conflict with FERPA[;]" (2) there is nothing "imminent" about Vanderbilt being precluded from creating a record at the administrative proceedings, because this has already happened; (3) Vanderbilt has a remedy through the administrative process that precludes a finding of irreparable injury; and (4) Vanderbilt has not shown that it is likely or imminent that it will lose federal funding if it complies with the Regulations. (Doc. No. 39 at 19–22).

---

[20] To the extent Vanderbilt asserts other injuries in the election proceedings, the Court has already found it does not have subject matter jurisdiction to consider such claims. See supra, Section II.A.1.c.

To demonstrate irreparable harm, Vanderbilt must show that it will suffer "actual and imminent" harm, "rather than harm that is speculative or unsubstantiated." Abney v. Amgen, Inc., 443 F.3d 540, 552 (6th Cir. 2006). Vanderbilt does so, here. As discussed above, Vanderbilt has already shown that it has suffered past harm that is actual, pervasive, and continuing, in that it remains subject to the repercussions of not abiding by the Regulations during the election proceeding because it now faces a proposed student union petition that it contends is inappropriate. See supra, Section II.A.3. Defendants contend that Vanderbilt's harms emanating from the preclusion ruling could be remedied by "a 'technical 8(a)(5)'" proceeding.[21] (Doc. No. 39 at 20). That is simply not the case. While Defendants are correct that the parties can proceed with a technical 8(a)(5) proceeding to address the merits of the preclusion order, it is doubtful to assume the Board will find its *own* agency's enforcement of its *own* Regulations in violation of FERPA during such proceedings. Even if the Board does, Vanderbilt's harm persists. Regardless of the outcome of a technical 8(a)(5) proceeding, the reason for the issuance of the preclusion order in the first place—the Defendants' strict enforcement of the Regulations—remains. (See Doc. No. 27-6 at 649:11–650:3). After such proceeding, irrespective of the outcome, Vanderbilt will continue to be forced to participate in election proceedings governed by Regulations that could again force Vanderbilt to choose between its rights in NLRB proceedings and its federal obligations.

Further, the threat to Vanderbilt's loss of federal funding, should it be forced to continue to comply with the Regulations in this election, also establishes irreparable injury for the purposes of obtaining injunctive relief. Defendants contend that Vanderbilt losing its federal funding is

---

[21] In a "technical 8(a)(5)" proceeding, an employer can " refuse to bargain collectively with the representatives of his employees," triggering a test of certification case. See 29 U.S.C. § 158(a)(5).

speculative, given various actions have not occurred yet that would lead to such an outcome. (See Doc. No. 39 at 18). However, Defendants' strict enforcement of the Regulations puts Vanderbilt "at risk of losing [its] federal funding" in the imminent future. If Defendants strictly adhere to the Regulations as pertaining to the voter information list, as they did during the election proceedings, they may again force Vanderbilt to comply with 29 C.F.R. § 102.67(l) before the students' objections to the Second Subpoena are addressed.[22] U.S. Army Corps. of Engineers v. Hawkes Co., Inc., 578 U.S. 590, 600 (2016); see supra, Section II.A.3. And the threat of graduate students raising complaints as to such future disclosures in contravention to FERPA is particularly acute, given more than 100 students have already objected to the release of their FERPA-protected information requested in the Subpoenas. (Doc. No. 29 at 28:23–29:2). And two students have gone so far as to appeal the Regional Director's denial of their motion to intervene and stay enforcement of the Subpoena to the Board, demonstrating their persistence in ensuring their FERPA-protected information stays private. (See Doc. No. 1 ¶¶ 59, 62; Doc. No. 29 at 26:24–27:1 (there has been an "instance where students have gone the extra step to retain counsel and file a motion to intervene to protect their privacy rights")).

Vanderbilt "need not assume such risk[] [of losing federal funding] while waiting for [an agency] to 'drop the hammer.'" Hawkes, 578 U.S. at 600 (citing Sackett v. EPA, 566 U.S. 120, 127 (2012)). Defendants would have this Court force Vanderbilt to comply with the Regulations

_____

[22] It's worth noting that, to the Court's understanding, Vanderbilt's and the two students' appeals to the Board regarding the disclosure of FERPA-protected information are still pending, (Doc. No. 1 ¶¶ 61, 62), despite Defendants moving the election proceedings forward with strict adherence to the Regulations. Defendants' inflexible enforcement of the Regulations essentially requires Vanderbilt to potentially violate FERPA before it gets a meaningful opportunity to explain why it cannot do so. For this reason, among others, Defendants' argument that Vanderbilt has no irreparable harm because it can litigate the FERPA issue during subpoena enforcement proceedings fails. See supra, Section II.B.1.n.18.

and sit idly by, waiting for a student to file a complaint with the Department of Education regarding Vanderbilt's unlawful disclosure before it could bring suit and assert irreparable harm. (Doc. No. 39 at 18). The Court declines to adopt that approach. In their insistence that the NLRA's procedures account for Vanderbilt's harms, Defendants fail to properly consider that *their* enforcement of the Regulations are the problem at issue—a problem that remains irrespective of the outcome of further Board proceedings. Accordingly, given the past harm Vanderbilt has experienced during the election proceedings that continues to pervade, and the potential loss to Vanderbilt's federal funding should it choose to comply with the Regulations going forward to avoid being penalized in the election proceedings, the Court finds there is irreparable injury such that this factor weighs in favor of injunctive relief. See Daunt, 956 F.3d at 406; Jones, 569 F.3d at 265.

### 3. Harm to Defendants and the Public is Neutral

The Court considers the third factor (whether issuance of an injunction would cause substantial harm to the opposing party or others) and the fourth factor (the public interest) together here because the Government is the opposing party. Nken, 556 U.S. at 435. Taken together, the merged factor is neutral on whether to issue a preliminary injunction. See Daunt, 956 F.3d at 406. Vanderbilt contends that the balance of equities favors its requested relief, given an injunction: (1) will preserve its right to participate fully in the election hearing process; (2) will protect its students' rights to privacy; and (3) will not harm any other individuals, as "[n]o person has an interest in violating the rights Congress bestowed on students[.]" (Doc. No. 12 at 22). Defendants disagree, asserting that the balance of equities weighs against injunctive relief because such relief would "have the practical effect of denying over 2,000 graduate student employees access to the statutory procedures needed to enable them to exercise their fundamental right to choose a representative for collective bargaining." (Doc. No. 39 at 22). Defendants further assert that

58

impeding the NLRB's procedures through injunctive relief "interferes with employees' efforts to improve their immediate conditions, contrary to the NLRA's policy[,]" (id. at 23) and great weight should be given to the fact that Congress has already declared the public's interest and created a regulatory framework pursuant to the NLRA. (Id. at 22).

Weighing these factors together, the Court finds the net harms and benefits to the public are even. The Court agrees with Defendants that an injunction may cause harm to others, particularly the majority of graduate students who have not objected to the disclosure of their FERPA-protected information. (See Doc. No. 29 at 28:23–29:2). It is true that the issuance of an injunction may delay the administrative proceedings and may cause confusion as to the proper application of the Regulations. Admittedly, this may deprive those students of the ability to unionize as fast as they would have been able to but for the injunction. And the Court acknowledges that Congress has given the NLRB significant power to regulate the underlying election proceedings here, and the Court should not (and does not) interfere with that pursuit lightly. (Doc. No. 39 at 22).

However, Vanderbilt's significant likelihood of success on the merits is a "strong indicator that a preliminary injunction would serve the public interest." League of Women Voters of United States v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016). Contrary to Defendants' contentions, "[t]here is generally no public interest in the perpetuation of unlawful agency action." Id. (internal citation omitted). "To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" Id. (quoting Washington v. Reno, 35 F.3d 1093, 1103 (6th Cir. 1994)); see also Kentucky v. Biden, 23 F.4th 585, 612 (6th Cir. 2022) ("[T]he public's true interest lies in the correct application of the law."). And, in granting injunctive relief here, it will likely benefit the more than 100 students that have objected

to the disclosure of their FERPA-protected information under the Subpoenas. (See Doc. No. 29 at 28:23–29:2). Defendants' contention that Vanderbilt is "holding a petitioned-for election of over 2,000 students hostage to the privacy objections of a small fraction" is not well taken. (Doc. No. 39 at 24). As the Court gives weight that Congress enacted the NLRA, and created the NLRB, with specific objectives in mind that should not be lightly infringed upon, it also gives "great weight" to the fact that Congress similarly intended to declare and protect privacy rights of students under FERPA. See In re Sac & Fox Tribe of Mississippi in Iowa/Meskwaki Casino Litig., 340 F.3d 749, 760 (8th Cir. 2003). Indeed, that "small" fraction of students objecting here do so under those rights delegated to them by Congress, and those rights need not be set aside for agency expediency. See Nat'l Treasury Emps. Union, 617 F. Supp. at 371. Accordingly, the third and fourth factors as to whether to grant the preliminary injunction are neutral.

Overall, two of the four factors counsel in favor of issuing a preliminary injunction, and two are neutral. Balancing these factors together and considering that the irreparable harm requirement is in Vanderbilt's favor, see D.T., 942 F.3d at 326–27, the Court finds that the totality of the circumstances warrants that a preliminary injunction issue. See Jones, 569 F.3d at 265.

Considering this finding, Defendants' motion to suspend (Doc. No. 48) is moot. The motion to suspend is based entirely on the premise that the TRO has remained in effect since October 30, 2024. (Doc. No. 48-1 at 1). As the Court has repeatedly emphasized, that is not the case. (See Doc. Nos. 33, 51). While the motion to suspend would have been subject to the same preliminary injunction factors as just discussed, but with a different burden, the Court need not evaluate them here because the injunctive relief that Defendants seek to suspend pending appeal is not, and has not been, in effect. See Ohio ex rel. Celebrezze v. Nuclear Regulatory Comm'n, 812 F.3d 288, 290 (6th Cir. 1987) (factors governing a motion to stay under Rule 62(d) include

"(1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay").

In any event, even if the Court were to separately address Defendants' motion to suspend, the Court finds it would fail for various reasons. First, as an initial matter, Defendants provide the Court with no affidavits or other evidence supporting their assertions of harm. See Ohio ex rel. Celebrezze, 812 F.3d at 290. The Court puts this aside given the early stages of this case and the expediency through which the briefing has occurred. Second, Defendants' motion fails on the merits given: (1) Defendants have not demonstrated more than a "possibility" of success of succeeding on their appeal, see Mason Cnty. Med. Ass'n v. Knebel, 563 F.2d 256, 261 n.4 (6th Cir. 1997), given that the TRO was dissolved on November 13, 2024 (Doc. No. 51) and they now seek interlocutory appeal over what is a non-appealable order, see Nutrasweet Co. v. Vit-Mar Enterprises, Inc., 112 F.3d 689, 692 (3d Cir. 1997) ("As a general proposition, orders granting or denying temporary restraining orders are unappealable."); Ne. Ohio Coal. for Homeless & Servs. Emps. Int'l Union, Loc. 1199 v. Blackwell, 467 F.3d 999, 1005 (6th Cir. 2006) (rationale for TRO orders not being appealable is that they are "of short duration and usually terminate with a prompt ruling on a preliminary injunction, from which the losing party has an immediate right of appeal"); (2) Defendants' argument that the Court is imposing a substantial and "unjustifiable" burden on the NLRB is unconvincing in light of the fact that the Court finds Vanderbilt likely to succeed on the merits of its claim that it is applying the Regulations in contravention to FERPA, see supra, Section II.B.1; (3) while the students seeking to unionize that do not object to their FERPA-protected information being disclosed may have been harmed absent a stay pending appeal *if* the temporary restraining order remained in effect, those that seek to protect their information from

disclosure would have been protected by such relief, see supra, Section II.B.3; and (4) the Court is unpersuaded by Defendants' argument that Vanderbilt possesses adequate legal remedies foreclosing relief, as they again incorrectly assume that the NLRA provides complete remedies for relief, even in the face of its own agency allegedly applying regulations not in accordance with the law. (See Doc. No. 48-1). Third, even if the Court had extended the October 30, 2024 temporary restraining order to date, the motion to suspend would be of no moment in light of this Court's appealable order imposing a preliminary injunction that allows for the election proceedings to move forward, as Defendants request. See Blackwell, 467 F.3d at 1005.

   C. Scope of Injunctive Relief

Now that the Court has determined injunctive relief is appropriate here, it must determine the scope of that injunction. It is unclear the scope of the preliminary injunction Vanderbilt seeks here. (See Doc. No. 12 at 2 (Vanderbilt contending that it will seek a preliminary injunction "requiring the NLRB to adopt processes and procedures compliant with FERPA, and restoring Vanderbilt's right to fully participate in the NLRB's proceedings regarding the election petition."); Doc. No. 40 at 2 ("The Court should declare the [R]egulations unlawful and enjoin Defendants from enforcing them.")). The Court will therefore "narrowly tailor[] the injunction to the demands of the instant litigation[.]" Prevatte v. Nat'l Ass'n of Sec. Dealers, Inc., 825 F.2d 411 (6th Cir. 1987) (table); see State of Tennessee, 104 F.4th at 615 (affirming district court granting preliminary injunction pertaining to APA claim where injunction did not "step on the toes of another court"). Here, Vanderbilt is likely to succeed on the merits that Defendants' application of the Regulations, as applied to it here, is not in accordance with FERPA and therefore violates the APA. As a result, going forward, the Court will enjoin Defendants from applying and enforcing the Regulations to Vanderbilt in a way that violates the APA or FERPA.

**III.  CONCLUSION**

For the foregoing reasons, Vanderbilt's Motion for Preliminary Injunction (Doc. No. 11) will be granted with respect to its request for injunctive relief regarding to the Regulations only, and will be denied in all other respects; Defendants' Motion to Dissolve (Doc. No. 30) will be granted to the extent Vanderbilt seeks direct review of the Board's preclusion decision and enforcement of the Subpoenas, and will be denied as moot in all other respects; and Defendants' Motion to Suspend (Doc. No. 48) and Motion to Reconsider (Doc. No. 43) will be denied as moot.

An appropriate order will enter.


_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE